**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL CASE NO. 1:22−cv−05273** |
| | ) | |
| **v.** | ) | **JUDGE MARTHA M. PACOLD** |
| | ) | |
| **THE UNIVERSITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**REPLY DECLARATION OF PLAINTIFF JOHN DOE, A PSEUDONYM**

---

**JOHN DOE, a pseudonym,** hereby declares, subject to the penalties of perjury pursuant to 28 U.S.C. § 1746:

1. I am the Plaintiff in the above-captioned action. During the events described herein, I was a full-time Graduate student at the Defendant University of Chicago ("Defendant University") who had expected to graduate in the Spring of 2022. I was a well-respected and highly regarded member of the University of Chicago community, holding numerous leadership positions in clubs and organizations. I have one class left to complete prior to graduation, but have been suspended for seven quarters due to being subjected to unfair disciplinary processes resulting from false and exaggerated accusations against me and was not allowed to graduate on time. I have served four quarters of the suspension. I have already suffered irreparable damage to my reputation and am trying to prevent irreparable harm to my career. I submit this Declaration in support of my motion for a preliminary injunction to enjoin Defendant University from (i) continuing my suspension, (ii) preventing me from taking my final course requirement for eligibility to graduate

(which course requirement may be satisfied virtually, and please note that both complainants are no longer at the University), (iii) preventing Defendant University not allowing me to graduate, and (iv) placing a disciplinary notation on my transcript. This Declaration will also refute claims made by University officials within the seven affidavits and numerous exhibits that the University submitted in support of its opposition to my motion for a Preliminary Injunction.

**<u>Non-Existent Delay To Bringing Suit</u>**

2. The University claims that I waited from April 2022 when I was suspended until September 2022 to file suit and February 2023 to seek a preliminary injunction. Such description fails to include the facts that: (i) the University was withholding the investigation reports for both Jane Roe 1 and 2 investigations from me and my counsel (Exhibits 1-4).: (ii) the University was provided with a draft of the Complaint but then delayed responding to a pre-litigation offer to negotiate (Exhibits 5-7).; and (iii) the university delayed responding to a settlement offer that would have obviated the need for the preliminary injunction (Exhibit 8, 9).

3. I requested a PDF version of the investigation reports from Dean Inabinet on 6/1/22, while they were still accessible to me via a ‘box folder’. The ‘box folder’ had restrictions that prevented me from downloading or printing the reports (Exhibit 1).

4. Between 6/1/22 and 6/6/22, the University removed such reports from the previously mentioned ‘box folder’ and thus I no longer had access to the reports to review with my newly retained counsel for this case.

5. On 6/6/22, Inabinet notified me that since both investigation and appeal processes were complete, the files had been removed and I would have to submit a formal FERPA request to receive access to the investigation reports (Exhibit 1).

6. On 6/6/22, I followed Inabinet's instructions and submitted a formal request (Exhibit 1, 2).

7. I did not receive access to the reports until 7/11/22 – a deliberate, purposeful delay in providing me with requested information. I was asking the University to share files that both parties knew existed and were readily available (Exhibit 3, 4).

8. I received access to redacted versions of the reports for ~2 business days via another box folder that did not allow for downloading or printing. I argued that this was in its own a violation because if I had asked for other types of student records such as: 1) an official transcript, 2) proof of enrollment, 3) or other student records, I would be given a hard and/or digital copy. The fact that the University only allowed me a brief window to access the investigation documents was done purposefully to disadvantage me in pursuing this lawsuit against the University.

9. Within a month of receiving access to the investigation reports and working with my newly retained counsel on the matter, I submitted a draft version of my Complaint to the University's Office of Legal Counsel on 8/4/22. A very timely response based on when we received access to the information (Exhibit 5).

10. On 8/10/22, the University's counsel reached out to my counsel and asked that we provide him with additional time to review the complaint. University counsel noted that they would be on vacation until the end of August and would revert back as soon as he could (Exhibit 6).

11. The University notified me that they were not open to negotiations on reducing my sanction on 9/9/22 and thus I filed the lawsuit on 9/27/22 (Exhibit 7).

**<u>The Job Offer and the Settlement Offer To Preserve It</u>**

12. The University states that the Exhibits A-1 and A-2 that I submitted as part of my initial motion for a preliminary injunction, do not specify that the degree I am pursuing is required

by my potential future employer. This is incorrect – on pg. 3 of exhibit A-1, the document clearly states… "your employment is contingent on…completion of successful reference checks and our background check, which may include **degree**, employment **verification**…". My graduate degree is required to commence employment – that is the degree that this contract of employment would seek to verify upon commencement (See screenshot below from Exhibit A-1):

> As discussed, your employment is contingent upon your passing a standard drug test, completion of successful reference checks and our background check, which may include degree, employment verification, credit card and other items subject to and in accordance with appliable law. In addition, you are required to provide the firm with proof of your fully vaccinated status against COVID-19 in advance of your Date of Hire, through the firm's HIPAA-compliant digital health. . .

13. The University then mentions that I have not testified in regard to being unable to extend my hire date. I was told by the Head of Recruiting for my program via a video conference, that regardless of the reason, I would not be given another extension to my offer letter.

14. The University's argument claiming that my situation does not constitute 'irreparable harm', fails to mention that formal recruitment for similar job opportunities at the graduate level only occurs in the Fall quarter. If the suspension is not reduced and I return to campus in January 2024, I would not have the opportunity to ever participate in formal recruitment ever again because since I only have 1 course remaining, I would graduate in March 2024. Thus, preventing from having the opportunity of going through formal campus recruitment for the same or similar work opportunity in the future.

15. On 12/23/22, my counsel submitted a very reasonable settlement proposal to the Defendant's counsel that would have obviated the need for the requested preliminary injunction (Exhibit 8).

16. On 1/25/23, I was informed by my counsel that the University declined my offer and failed to submit any counter proposal. This raised the need to pursue injunctive relief in order to prevent additional irreparable harm done to me (Exhibit 9).

**The So-Called "Supportive Measures".**

17. The Complaint alleges that the University received reports from three different students in the same graduate program accusing me of various acts of sexual misconduct.

18. To date, the University has only notified me of two complaints, from Jane Roe 1 and 2, and their reliance on an alleged complaint from a third complainant that was submitted, but then never investigated, totally irrelevant to the University's defense for any of their actions.

19. The University's mention, and confirmation that the complaint from a "Jane Roe 3" influenced their decision in imposing 'supportive measures' and 'emergency removals' show a clear deviation from procedure and gender biased approach to adjudicating alleged Complaints received against me.

20. Ms. Collier's claim that such 'supportive measures', which included being forced to step down from all of my leadership roles on campus, barred from participating in school clubs/organizations, barred from attending University sponsored trips, to be non-punitive in nature is quite ridiculous. Any reasonable and impartial individual would agree that all of the aforementioned 'supportive measures' imposed on me are punitive in nature, especially when you take into account that I had no overlapping courses or clubs with Jane Roe 2, who's formal complaint is what led to such measures. I was never made aware of a third Complaint from any University official. The University's response to my motion for a Preliminary Injunction filed on 3/3/23 is the first time I am hearing of it.

21. Ms. Collier again mentions that she conducted a ‘safety & risk assessment”, yet fails to provide details of such assessment in her affidavit. She only mentions factors she allegedly considered, but not how my case(s) at hand related and/or scored in regard to the factors of an individualized safety and risk assessment.

22. The Court should question the accuracy of Collier’s claims – most notably the fact that she submitted 10 exhibits, but failed to include a document showing the ‘safety & risk assessment’ she refers to multiple times in her testimony. I would infer that further evidence of gender bias and additional confirmation of the University relying on rumors in these processes to exist in such assessment – had Ms. Collier actually completed and documented such assessment(s). Ms. Collier’s actions against me should not only be thoroughly reviewed by this court, but also the Office for Civil Rights.

23. To support how the University responded to such complaints in the interim, the University highlights an excerpt from Jane Roe 2’s report: “I have heard of incidents involving 8 women of varying degrees of sexual assault within the [graduate program].”

24. I find the point above to further support my claims that the University was influenced by rumors and hearsay throughout both processes. Roe 2 doesn’t state that she “knows” of or that she can “prove” incidents of assault against 8 women – only that she **“heard”** of such incidents. The University leveraging a rumor of a rumor to support its actions and behavior towards me are a clear sign of gender bias. Furthermore, I was not even charged with sexual assault in the Roe 2 case.

**<u>The Investigations</u>**

25. The University argues that both Roe 1 and I submitted ‘new’ evidence in our optional responses not included in the investigation report. The University fails to clarify that the

purpose of the optional response, is to respond to the investigation report. The information I provided in the report was in response to such report, most notably witness statements and errors Inabinet made in documenting my interview. The University-wide Disciplinary system Policy states that "The complainant should make every effort to include in the complaint all germane facts known at that time and provide all available supporting materials." This rule was ignored by the Complainant, disregarded by Dean Inabinet during the investigation, and Dean Rasmussen in her review of my appeal of the Roe 1 outcome. The additional text messages I submitted as part of my optional response were in response to Roe 1's interview. In Inabinet's Exhibit 2-A, Pgs. 50-52 summarize Roe 1's interview. In her Interview Roe 1 states "she ran into John Doe a few months after the incident and John Doe told Roe 1 it was really hot when they were physical on the door…Roe 1 said this interaction happened at a party and John Doe seemed drunk at the time." The additional text messages I submitted in my optional response are from a conversation between Roe 1 and I on March 13, 2021, which were sent after the "party" Roe 1 references in the previous sentence. Roe 1 claims that at such party I reminded her of our encounter, which she alleges to be non-consensual sexual conduct, but then that same night texts me after the party / dinner we were at to see where I had gone. Again, her actions do not support her claims and more importantly, the additional evidence I submitted was in response to the investigation report. Roe 1's alleged journal entries were not submitted as a response to the investigation report.

26. The outcome notifications of both investigations fail to provide details as to how each committee determined sanctions, nor do they refer to any of the evidence I submitted in both investigations. They are mainly made up of a paraphrased version of each Complaint.

**Title IX Policy Versus Non-Title IX Policy**

27. It is accurate that when Ms. Collier notified me of each of the Complaints, the letters stated her determination of what policy both Complaints violated. Ms. Collier dismissed both Complaints under the Title IX Policy and determined both Complaints would follow the University's Harassment and Discrimination Policy.

28. I never contested Ms. Collier's dismissal of both complaints under the Title IX Policy because at the time, I did not understand the differences between such policies. No one at the University ever explained the differences between the policies with me.

29. Although these processes were managed under the University's Harassment and Discrimination Policy, I never signed a waiver or release of my Title IX rights.

30. As a result of these investigations being governed by the University's Harassment and Discrimination Policy, my support person and I were not allowed to cross examine either Complainant during the investigations or the hearings.

31. During both hearings, the Jane Roes and I were given the opportunity to submit questions that we would like to be asked of the other party to the respective faculty chair for review. Both Roe 1, Roe 2, and I did not submit questions during the hearing(s). My rationale for such decision in both hearings was based on the following: when questions are submitted, the faculty chair ultimately decides, 1) which questions to ask, 2) what order to ask approved questions in, 3) and if modifications to the wording of a question is needed. As a result of the aforementioned factors, I felt that since there was no guarantee that my question(s) would be approved and that they may even be slightly altered by the chair/committee, that I could be negatively impacted by doing so. Neither hearing was transcribed or recorded, even though I requested that they be.

**Jane Roe 1 Hearing**

32. The Jane Roe 1 Hearing took place on March 25, 2022. The hearing began with introductions from each of the committee members and the committee chair, Lenore Grenoble, proceeded to verbally describe the agenda of the hearing.

33. Prior to any questioning of Roe 1, who was to be questioned first, Inabinet unmuted himself and addressed the committee. He reminded the parties that they received images of a 'journal' in Roe 1's optional response and went on to describe how he authenticated the journal. He noted that a 3rd party not involved in the case showed him the journal via zoom and that he believed it to be an authentic journal because of it having multiple entries dated in chronological order.

34. Inabinet did not speak to any other evidence and then questioning began of Jane Roe 1.

35. Jane Roe 1 provided her recollection of events, noting that a misunderstanding on her part led to her believing more people would be at my apartment. Roe 1 admitted that our 'make-out' was consensual. Two key contradictions from her written Complaint, which Inabinet and Ms. Grenoble fail to mention in their testimony. The remainder of Roe 1's testimony went on to broadly regurgitate the false claims she made in her Complaint.

36. I remember Ms. Grenoble asking Roe 1 what she was wearing. Roe 1 was at her apartment in Chicago during the hearing and turned to her left and asked if she could show Ms. Grenoble the pants she claims she wore on the night of the alleged incident. To put this in context, Ms. Grenoble, allowed Roe 1 to present new evidence at the hearing, which I received no access to in advance of the hearing. This new evidence, which should not have been allowed, was

admittedly leveraged by Ms. Grenoble, in finding the Complainant more credible than myself. A factor that could have changed the outcome of the entire hearing.

37. At one point in her questioning Roe 1 starting crying when answering a question. I do not recall the question, but I do recall the Committee ending her questioning shortly after she started crying.

38. I recall receiving many more questions than Jane Roe 1 during the hearing, and to a certain extent, the questioning I received from committee members was trying to get me to fall into the trap of saying an inconsistency in my story. I believe this because I remember, on multiple occasions, different committee members asking me, basically, the same question.

39. Outside of Ms. Grenoble asking me to walk through my recollection of events, I only remember her asking me one other question, which was "How many drinks did you have that night?". I thought it was a ridiculous question because the night in question was 18 months prior to the hearing, but I responded calmly and truthfully in saying that "I did not remember because the night was so long ago."

40. When the Committee asked both parties their questions, they gave us both the chance to submit questions for review, which the Committee would review, and decide on if they would ask such question. Both Roe 1 and I declined to ask each other questions.

41. It was at this point, that I said I do not have questions for Roe 1, but I have questions for Dean Inabinet. This is when my support person pulled up the outline of the hearing and the policy and highlighted the areas that Inabinet had violated by giving his testimony in support of Roe 1's journal entries at the start of the hearing. I remember asking him a series of questions, of which, I recall the following questions I asked: 1) How was he so confident that he had done an adequate job of authenticating the journal, and 2) Why did he allow the journal entries to be shared

in Roe 1's optional response as it did not constitute 'timely access' to materials as provided by the applicable University policy, and 3) Why didn't he speak to any of my evidence? Inabinet did not respond to any of my questions and said we could speak after the meeting to discuss procedural irregularities.

42. The point above was one of contention, and to be frank, very awkward for Dean Inabinet. He seemed shocked that I questioned him in front of the Committee. This is why I find it very hard to believe that he does not mention this in his affidavit and neither does Ms. Grenoble. Their recollection of selective events during the hearing for Roe 1 to fit their narrative should not be taken at face value by this court.

43. Roe 1 submitted no evidence during the 5-month long investigation or with her complaint. This can be confirmed by a review of the Roe 1 investigation report. She waited until the optional response was due to submit faulty journal entries, which the investigator gave credence too when he testified for Roe 1 at the hearing. This Committee if acting fairly and impartially had no evidence, using a preponderance of the evidence standard to find me responsible for any policy violation.

44. On March 29, 2022, I was found responsible for sexual assault in the Roe 1 case and received a four-quarter suspension.

**Jane Roe 2 Hearing**

45. The same day, March, 29, 2022, that I was notified of being found responsible in the Roe 1 case, I requested an extension of the Roe 2 hearing. I informed Dean Inabinet that I wanted an extension because I wanted to appeal the Roe 1 finding. Additionally, from a mental and physical standpoint, I believed it was unfair that the University was subjecting me to a hearing

within 48 hours of being (wrongly) found responsible for another case. Inabinet declined the request, and details of conversation can be found in Exhibit 10.

46. On March 31, 2022, I attended the Roe 2 Hearing. Not only did I ask for this hearing to be in person, but I also asked that it be extended. Both requests were denied. At the time, the University had lifted all of the COVID-19 protocols previously in place.

47. As I mentioned in my complaint, one of the members of the Committee apparently had an internet outage that led to the meeting being delayed by ~30 minutes. While both Roe 2 and I experienced the same delay, I was more disadvantaged by such delay because I was the party facing a sanction.

48. The hearing began with introductions and each party was asked to summarize their recollection of the alleged incident. Roe 2 went first. After her initial summary of what allegedly transpired that night, no committee member said anything. During her testimony, Roe 2 confirmed that although she "never drinks alcohol", she had more than one drink at the event on October 22, 2021. I do not recall if Roe 2 was able to testify to the specific number of drinks she believed to have had that night. As a result of her verbal admission to drinking, I find that Ms. Paulus and Mr. Allen were both very ignorant and biased in their affidavits, by claiming she was "sober" and I was not.

49. I submitted 'redaction and change' requests as part of my optional response to the investigation report. These requests were submitted because Inabinet documented my interview incorrectly to fit the narrative he wanted the committee to believe and included information that he knew to be false into the investigation report. Once he refused to make changes to the investigation report, my only option was to include such requests in my optional response and hope they committee would take them into account – they obviously did not because in the

outcome letter I received as part of the Roe 2 hearing, they note Roe 2's witness statements as evidence that the committee leveraged in finding Roe 2 more credible than I was.

50. Both Ms. Paulus and Mr. Allen state in their affidavits that they had some "concerns" with the fact that Roe 2 decided not to submit an optional response. Paulus states "John Doe's response to the investigation report had been submitted only two days prior to the hearing. As a result we decided to ask Jane Roe 2 if she wanted to verbally respond to the investigative report during the hearing." I question why my optional response being submitted only two days prior to the hearing was relevant to determining that Roe 2 should be afforded more time and multiple opportunities to verbally respond to the investigation report in the hearing. Roe 2 was given the same amount of time and the same deadline to submit an optional response as I was.

51. I was questioned second in the Roe 2 hearing. Similar to the Roe 1 hearing, I believe I was asked many more questions, and the manner of such questioning seemed to have a goal of finding an inconsistency in my story. I believe this because I remember, on multiple occasions, different committee members asking me either the same or a very similar version of a previously answered question.

52. After I provided my initial recollection of the event from my perspective, Mr. Allen made a sarcastic comment. He said something along the lines of: "You seem to have a great memory for someone who was intoxicated." I did not respond to such comment, but I made a note of it.

53. Contrary to Mr. Allen's affidavit, he made such remark towards me after the first question I answered. This showed me that Allen and likely the rest of the Committee were already biased towards me. He questioned my credibility in a sarcastic manner after the first question I answered.

54. Mr. Allen's affidavit makes generalizations to help support the faulty narrative he is trying to support and includes inconsistencies that should reduce his credibility. He fails to mention when I used the excuse of being "too intoxicated" (which I never said), to not directly answer a question and what were the "things" that I could not recall were during the hearing. He never states in his testimony what I "could not recall."

55. Furthermore, while I did accept responsibility for sexual harassment, I made it clear to the committee that I was NOT accepting responsibility for the sexual abuse charge. My support person and I did a thorough review of prior disciplinary reports, and no student in the past 5 years who had been found responsible solely for a sexual harassment policy violation was suspended. This was a strategic decision for how I had to approach this hearing, since I had been found responsible in the Roe 1 hearing. I told the Roe 2 Committee that she had failed to submit an optional response, any video or picture evidence, testimony from her roommate even though Roe 2 claimed her roommate was at the apartment during then night in question, and both of her witnesses submitted faulty or generalized information (which I explain in my appeal requests submitted with the PI motion). This Committee, if acting fairly and impartially, had no evidence, using a preponderance of the evidence standard, to find me responsible for sexual abuse.

56. Mr. Allen also confirms that this committee leveraged prior disciplinary history to deliver the three-quarter sanction and that they were made aware of other Complainant's and alleged incidents I was involved in via "letters" that were presented to the Committee. This should not have occurred. Per the policy and my initial discussions with Inabinet, both instances were supposed to be adjudicated separately. Allen is admitting the fact that the Committee relied on information from both investigations to not only find me culpable, but also issue a disproportionate

sanction against me. I would infer that Mr. Allen was on of the two members on this panel seeking that I be expelled.

57. At the hearing, the committee asked Jane Roe 2 what her desired outcome was. Roe 2 responded by asking the committee that I be expelled. I do not recall being asked the same question.

58. I was found responsible of sexual harassment and sexual abuse as a result of the Roe 2 hearing and sanctioned with an additional three-quarter suspension, banishment from campus and from participating in any clubs or holding leadership positions. Additionally, I would be barred from attending any graduation events whenever I would be eligible to graduate.

59. Due to the fact that my support person in both cases, Michael Cheronis, was an attorney, a representative from the University's Office of Legal Counsel attended both hearings. I find it surprising that the University did not submit an affidavit from this representative from the University's Office of Legal Counsel. I asked Inabinet for this employee's contact information in April 2022 and Inabinet declined to provide me with such information.

**<u>My Response to the Affidavits and Exhibits the University Submitted</u>**

60. In its response to my motion for a Preliminary Injunction, the University has tried to distract this court with a plethora of documentation, including seven affidavits from University officials that recall and summarize incorrect, non-specific, and misleading statements. I have detailed my response to such affidavits in Exhibit A: John Doe Response to Affidavits. Exhibit A and this Declaration also serve to argue against any of the University's Non-Gender Biased Evidence that was submitted as Exhibit 8 in the University's memorandum in opposition to my motion for a preliminary injunction.

61. I have submitted Exhibit A: John Doe Response to Affidavits with this Declaration. In Exhibit A, I raise questions that the court should ponder and point out discrepancies from the University's recollection of events that transpired versus mine. In summary, all of the affidavits fail to analyze or even make mention of any of the evidence I submitted in both investigations and provide no context into the deliberations that occurred for finding me responsible or as to how the University came to the determination of such sanctions.

62. Due to FERPA regulations and privacy protections to help limit the harm I am facing from raising this lawsuit, this court has unfortunately not been able to assess one of the key pieces of evidence I submitted in the Roe 1 investigation. Inabinet's Exhibit 2-A is a redacted version of the Roe 1 investigation report. On Pg. 19 there is a text conversation in which Roe 1 sends me an image taken from her mobile device of a selfie image she took of both of us at an event that occurred in mid-March 2021, around five months after the alleged incident. Her caption to such image was "Also while I was looking for a photo I came across this and it made me smile so I thought I'd share". None of the affidavits from Rasmussen, Inabinet, or Grenoble mention this powerful piece of evidence. Roe 1 was never even asked about such image during the hearing. The court should apply common sense, something that the University did not do in the Roe 1 proceeding, in evaluating the point that if I had actually done any of the wrong things Roe 1 alleged in her complaint, why would she send me a picture of us together and why would such picture make her smile…

63. In the Roe 2 investigation report, which was submitted by the University as part of Inabinet's Exhibit 2-B, Pgs. 36-39 of the investigation report summarize Roe 2's interview. Roe 2 states "John Doe did not seem very intoxicated", yet Mr. Allen testifies in his affidavit that "Given how intoxicated both parties reported John Doe to be", he found Roe 1 to be more credible. To be

clear, Roe 2 is stating that I was not that intoxicated and Mr. Allen continuously states in his testimony that I was severely impaired by alcohol. I never said in the hearing that I was severely intoxicated / impaired from alcohol. Mr. Allen obviously did not read the investigation report, or worse, deliberately disregarded information that could benefit me.

64. Furthermore, in Roe 2's interview, she states that she got into the bed with me, after I allegedly exposed myself and verbally propositioned her for sex. She answers Inabinet by saying she decided to enter the bed with me because "she was tired." If the chronology of events actually transpired like this and Roe 2 truly felt uncomfortable about the situation – her actions do not support her complaint. Roe 2 could have notified her roommate (who she states was home the whole time), her doorman (Roe 2 lived in a full-service building with a 24-hour doorman), or the police. She did not and instead entered the bed with me. Roe 2's version of events do not support her actions. Again, I ask the University to apply common sense in evaluating the evidence provided to the University and question how the University, if truly adjudicating these complaints as a gender-neutral, impartial party, could have come to the determinations of culpability and the sanctions they gave me.

65. In his written testimony, Inabinet provides evidence that supports the fact that the seven-quarter sanction I received is disproportionate. Per his affidavit:

> "The total length of the suspension meant that not only would Jane Roe 1 and Jane Roe 2 have completed the [University] program that typically takes two academic years to complete, but so too would all of the students who were enrolled in the [University] program as of Spring Quarter 2022 when his suspension began."

66. If the goal of the suspension was to "ensure that all of the students who were enrolled in the [University] program as of Spring Quarter 2022" would complete the program before I returned to campus, then the total suspension for both violations should have been 5 quarters cumulatively, instead of 7, and set to end in June, 2023.

67. On March 17, 2022 and March 23, 2022, I sent requests to Inabinet to redact certain information from the investigation reports and to correct pieces of my interview summary that I believe were documented incorrectly for both investigations. These requests are summarized in Exhibits 11 and 12.

68. In response to my March 17, 2022 request regarding redactions and changes to Roe 1 investigation report, Inabinet emailed me for "clarification" on March 17, 2022. He wanted to know how I came up with replacements to my change requests. I explained to him that I remembered what I said and that I reviewed the notes my support person had taken during the interviews to come to such determinations. In trying to "clarify" my request, I believe Inabinet was only trying to get me to admit that I recorded my interview – which could be considered a separate violation of the policy. This email exchange is included in Exhibit 13. I did not record either interview, even though I requested that both be recorded and that I would sign a waiver to allow for such recording. This request occurred over a zoom meeting I had with Inabinet prior to my interview in early February, 2022.

69. On March 18, 2022, Inabinet responded to my request related to the Roe 1 investigation, detailed in Exhibit 11, by rejecting all of my redaction requests and making three changes to the report. Two of the three changes were replaced with wording that satisfied my request and one did not. This exchange is detailed in Exhibit 14.

70. On March 24, 2022 Inabinet responded to my request related to the Roe 2 investigation, detailed in Exhibit 12, by rejecting all of my redaction requests and making one change to the report that did not satisfy my request. This exchange is detailed in Exhibit 15.

71. The fact is that Inabinet included irrelevant, biased, and outright incorrect information in both investigation reports that were sent to the Committees. Furthermore, both Roe

1 and Roe 2 were allowed to reference each other's claims in their respective reports. These two cases were never adjudicated separately. Inabinet's decision to deny all of my redaction requests and most of my change requests disadvantaged me severely in these processes. I would argue that the outcome of one if not both hearings / sanctions would have been different had the University recorded my interview(s), which would have removed the need for change requests, and reviewed my redaction requests from an impartial, gender-neutral perspective.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on this 13th day of March, 2023.

______*John Doe, a pseudonym*______
**John Doe, a pseudonym**

**Certificate of Service**

I, Philip A. Byler, Esq., caused to be served the foregoing document by e-mail upon:

Scott Warner, Esq.
Husch Blackwell LLP
312-526-1633
Scott.Warner@huschblackwell.com

Dated: March 13, 2023

______*Philip A. Byler, Esq.*_____
Philip A. Byler, Esq.