# EXHIBIT A: JOHN DOE RESPONSE TO AFFIDAVITS

## Exhibit A: John Doe Response to Affidavits

| Name | Exhibit | Bullet | University Statement | John Doe Response |
|---|---|---|---|---|
| **Collier** | **1** | **6** | "From my recollection, the emergency removals occurred in matters either involving multiple allegations… or involving allegations of sexual assault involving choking." | First off, Collier is the Title IX Coordinator of the University. Why is she prefacing her statement by saying, "from my recollection"? She has access to the information in question and should be able to give a definitive answer.<br><br>Jane Roe 1 never claims that I choked her. Collier and later Inabinet both mentioning "Involving choking" based on what Roe 1 actually submitted, is an inference deduced from pure gender bias. Collier determining this from Jane Roe 1's report is not accurate and an example of how the University modified wording in documentation to better support the narrative Roe 1 was trying to convey. |
| **Collier** | **1** | **7** | "I received a report from filed by a second-year student…This student's report indicated that she intended to file the report as a formal complaint." | I deny any allegations of whatever sexual misconduct this point alleges and want to make clear that the student referenced here decided not to file a formal complaint. Thus, anything related to this point or (false) allegation is irrelevant. The impact of such complaint, which was never formally investigated by the University, shown to me, or with any associated evidence accompanying its submission holds no weight in the case at issue, with the exception that it proves the University leveraged rumors to subject me to harsh 'supportive' and interim measures. Collier admitting that it factored into her decision for an 'emergency removal' not only points to a procedural deviation, it also confirms my allegation that throughout the case, the University leveraged hearsay and rumors to adjudicate my cases. Believing these 'rumors' and mostly false allegations from three female complainants without giving my denial responses the same weight is a clear sign of gender bias. |
| **Collier** | **1** | **11** | "the University had received two reports accusing John Doe of sexual misconduct from two different students in a short time, I also informed him in this notice that he would not be permitted to lead or participate in any [program]-sponsored student groups and clubs or attend [program]-sponsored treks or trips. This was not an emergency removal but were interim and non-punitive measures intended to restore and preserve equal access the University's educational programs and activities..." | Contrary to Collier's false testimony, at this point (November 5th, 2021), I had only received notice of one formal complaint and for the reasons I mention in #7, the report submitted on 10/29 should have held no weight in any decision for interim measures (sanctions) placed upon me. As of result of such measures, I was removed from all of the leadership roles I held on campus, and barred from participating in student groups, clubs, or attending university sponsored trips. The measures were in place from November 5th, up until the day I was notified that I was suspended in the Jane Roe 1 hearing in March, 2022. An impartial and rational individual could deduce that being given such measures were punitive in nature since the initial complainants and myself did not overlap in any classes, groups, or leadership positions. Collier submits 10 exhibits but fails to include or detail the safety & risk analysis she allegedly completed. |
| **Collier** | **1** | **13** | Collier is summarizing Roe 1's complaint. | I deny these allegations in my complaint and in all of the documents I submitted as part of the Roe 1 investigation. |
| **Collier** | **1** | **14** | "I conducted an initial individualized safety and risk analysis based on the three reports…My determination was based on the allegations that John Doe had committed serious sexual misconduct with three different students.."<br><br>"Additionally, we learned that John Doe had plans to go on a trip with other classmates in which he would be alone with them in a remote location...I was able to narrowly tailor the emergency removal." | Collier submits 10 exhibits but fails to include or detail the safety & risk analysis she allegedly completed. Collier again admits that she leveraged alleged information from a third complainant, who ultimately decided not to file a complaint, in her analysis.<br><br>The trip Collier is referencing in this point was not sponsored by a University group or organization. It was a trip that was set up, paid for, and organized fully outside of the University. It is true that other students in my program were planning on attending, but if limiting my involvement in non-University trips was part of Collier's goal in her emergency removals, then I find it very disingenuous that she was trying to 'narrowly tailor' any removals she instituted. She did the opposite of 'narrowly tailoring' the emergency removal. Collier removed me from every aspect of the program I was in, ranging from social, academic, and career related activities / opportunities. I was only allowed to attend classes virtually. |
| **Collier** | **1** | **19** | "John Doe was provided with the requested reimbursement in full." | I was mostly reimbursed; I never received $333 ($333.3 per quarter) of stipend I was owed from admissions for being an admissions fellow, which I had to forgo for the Winter 2022 and Spring 2022 quarters. |

| Name | Exhibit | Bullet | University Statement | John Doe Response |
|---|---|---|---|---|
| **Collier** | **1A** | **N/A** | Collier is presenting a complaint received from a student that the University never investigated of notified me about. | Student may have 'intended' to file a formal complaint, but student, for whatever reason, never did. This report is irrelevant and the fact that it influenced Collier's decision-making for interim measures and emergency removals show clear gender bias. Additionally, how did the Title IX office derive that a violation occurred from what this exhibit says? Complaint gives no details about what she said 'no' to or as to how I was allegedly 'aggressive' towards her, lastly she ends her statement, according to this corrected account "and I just gave in." Based on the low-level of detail and generalized statements included in this exhibit, I would argue that a reasonable person could infer that this is admission of consenting to a sexual encounter, instead of a policy violation. To reiterate, I deny any allegation of or inference in wrongdoing as a result of this exhibit. |
| **Collier** | **1B** | **N/A** | Collier is presenting the complaint submitted by Roe 2, including relevant attachments that Roe 2 submitted with her Complaint. | The attachments submitted with such complaint were not shared with me until 6 weeks after my response was due, which has been detailed in my complaint. |
| **Inabinet** | **2** | **17** | "…I discovered an administrative oversight…The error was corrected on February 3, 2022, and John Doe was given the option to amend his response to Jane Roe 2's complaint…" | Giving me the option to amend my response, six weeks after I submitted it, did not rectify the issue at hand; an 'administrative oversight' impacted my strategy for this case and I was thus disadvantaged for the remainder of the investigation process in the Roe 2 investigation. |
| **Inabinet** | **2** | **21** | "I did not give any of the parties a deadline for identifying witnesses;…" | The letter Inabinet sent me on 1/20/22, clearly states "lastly, you will be asked for the names of any witnesses you would want contacted during the investigation and what relevant information they provide." The point is made in regard to what will be the last question Inabinet will ask during the interview for each case. I was interviewed on 2/9/22 for both cases and requested additional time during my interview to provide witnesses, which were provided to Inabinet on 2/18/22. |
| **Inabinet** | **2** | **21** | "I am not aware of any witness identified by John Doe whom I did not interview or attempt to interview." | On 3/10/22, I notified Inabinet that two of my witnesses were never contacted and he subsequently reached out to them and provided them limited windows to meet. The first version of the Roe 1 investigation report only had a placeholder for one of my witnesses because Inabinet initially forgot to contact such witness. |
| **Inabinet** | **2** | **28** | Inabinet is describing how he came to be aware of Roe 1's journal entries and the meeting he had with Roe 1's roommate via Zoom, in which he supposedly vetted the journal. | Inabinet fails to note that Jane Roe 1's study abroad program ran from Mid-Jan to Mid-March. She had ample time to submit such journal entries in the period from her filing a complaint on 11/4/21 and leaving for her program sometime in January 2022; Again, the policy states that a complainant should submit evidence available at the time of the complaint with the complaint. |
| **Inabinet** | **2** | **28** | Inabinet is describing how he came to be aware of Roe 1's journal entries and the meeting he had with Roe 1's roommate via Zoom, in which he supposedly vetted the journal. | In the hearing, Jane Roe 1 testified that she did not submit the journal with her complaint or during the 5-month long investigation because she forgot she had the journal under her bed; a fact that Inabinet omits from his affidavit. |
| **Inabinet** | **2** | **29** | "…I explained all of this without saying anything about whether the journal was authentic or hard been fabricated." | Inabinet claimed in the hearing that 'he believed the journal to be authentic'; giving gender motivated testimony to support Roe 1, who prior to her optional response, submitted no tangible evidence to support her claim; even her witness statements do not support her claim. Roe 1's witness statements actually do more to support my testimony than hers. |
| **Inabinet** | **2** | **29** | "I simply explained how the journal entries came to my attention and what I did to view them." | on 3/23/22, Inabinet states that he was "working with the Complainant to validate the authenticity of the journal and the entries shared. I will provide the outcome of the endeavor to the Committee and both parties." Inabinet never did so in advance of the hearing, and fails to mention that he was unprompted to state the journal was authentic and how he came to that conclusion at the start of the Jane Roe 1 hearing. |
| **Inabinet** | **2** | **29** | "John Doe included new information about additional text messages that he had not previously submitted." | The 'new' information that I submitted was in response to the investigation report, which is the role of the optional response. |

| Name | Exhibit | Bullet | University Statement | John Doe Response |
|---|---|---|---|---|
| **Inabinet** | **2** | **29** | "…I do not recall if John Doe addresses the journal entries at the hearing." | How could Inabinet not recall if I addressed the journal entries at the hearing? In my response to one of the committee's initial questions, I stated that if Jane Roe 1 truly had these journal entries when she claims to have written them (December 2020), that she would have submitted them with her complaint. The student member of the panel asked me if I was suggesting that the entries were 'fabricated' and my response was that I believed they were and that Roe 1 strategically withheld them from the investigation until I could not have an expert witness review them or submit a written response in regard to the journal in advance of the hearing.<br><br>EQUALLY AS IMPORTANTLY, once Jane Roe 1 was done with her set of questions, the committee asked me if I had any questions for her. I said no, but that I had questions for Inabinet. I asked him a series of questions that Inabinet refused to answer in the hearing which ranged from: 1) Why he was so confident he did a good job of authenticating the journal since he admitted that it was shown to him by a 3rd party not included in the case via Zoom the day before the hearing; 2) why he didn't mention that that this breached the policy in terms of receiving timely access to evidence in advance of the hearing (I received access to the journal 2 business days before the hearing), and 3) why he didn't testify to support any of the evidence I submitted? |
| **Inabinet** | **2** | **30** | Inabinet describes an email exchange between him and I. | This email exchange occurred after Inabinet confirmed that he would not withhold the journal entries from the committee; the last thing I wanted him to do was do what he did in the hearing and provide testimony to support her evidence, which he did anyway, an act that a reasonable and impartial person could infer resulted from gender bias Inabinet had in terms of favoring female complainants. Inabinet also fails to acknowledge that my email is the 'most recent' in that chain because he never responded to me about what the outcome of his 'endeavor' in validating the journal was prior to the hearing. |
| **Inabinet** | **2** | **33** | "One member of the University-wide Disciplinary Committee that heard Jane Roe 2's complaint against John Doe lost his Zoom connection shortly before the March 31, 2022 hearing was scheduled to begin. As a result, the hearing began approximately 30 minutes later than scheduled as arrangements were made for this Committee member to attend the hearing via telephone." | At the time of Roe 2 hearing, and I believe at the time of the Roe 1 hearing as well, the University had lifted all COVID related protocols and I requested that the hearings be in person. Inabinet's responded by saying: "We are currently not holding hearings in-person. We have been holding hearings via Zoom since the start of the pandemic and there is no evidence to suggest the medium is any less or more favorable to participants."<br><br>The fact that one committee member lost internet connection, and thus had to dial-in to the hearing via phone 30 minutes after the scheduled start time put me at more of disadvantage than it did to Roe 2 because I was the one who was dealing with the stress of possibly being sanctioned. |
| **Inabinet** | **2** | **34** | "I recall one Committee member, Michael Allen, making a comment about being surprised that John Doe was able to recall certain things given how intoxicated John Doe was during the incident.." | Mr. Allen's comment occurred right after I answered the first question I was asked of the committee. Which was "Please provide us with your recollection of the incident?" Jane Roe 2 received the same question and after she finished, the committee went on to ask other questions. No committee member questioned her credibility or recollection after her initial overview or throughout the course of the hearing. The fact that Michael Allen made this sarcastic comment questioning my recollection of events after my answer to the committee's first question of me proves that I was not receiving a fair, or impartial process, but that I was being discriminated against as a result of gender. |
| **Inabinet** | **2** | **38** | "In the matter involving Jane Roe 2's complaint against John Doe, I informed the Committee once the Committee had decided that John Doe had violated the Policy on Harassment, Discrimination, and Sexual Misconduct about the outcome that had been reached in the matter involving Jane Roe 1 so that this information could be taken into account in deciding on what sanction or sanctions should be imposed for his policy violations in relation to Jane Roe 2." | Informing the committee in Jane Roe 2 of the outcome in Jane Roe 1 was done to ensure I received a harsher sanction. Whether of not Inabinet will admit that point, a reasonable person could deduce how divulging information of prior disciplinary to a committee determining a sanction in advance of their determination of a sanction, will lead to a harsher sanction. |

| Name | Exhibit | Bullet | University Statement | John Doe Response |
|---|---|---|---|---|
| **Inabinet** | **2** | **39** | "(3) the impact of the violation(s) on the complainant and whether the complainant expressed any preferred outcome or ongoing safety concerns…" | Why is whether the complainant expressed any preferred outcome a factor in a respondent's sanctioning. This alludes to the point of gender bias existing in this process as a result of the fact that most respondents are indeed, male. |
| **Inabinet** | **2** | **42** | "The Committee also noted that Jane Roe 2 was quite open with other students in the [University] program about her negative experience with John Doe, which then seemed to prompt other students to share that they had had a similar experience with John Doe." | THE COMMITTEE IS BLATANTLY ADMITTING TO RELYING ON RUMORS SHARED BY ROE 2 WHEN THEY SAY THIS. What "other students" are they referring to - this has to be investigated more via cross-examination. |
| **Inabinet** | **2** | **42** | "The total length of the suspension meant that not only would Jane Roe 1 and Jane Roe 2 have completed the [University] program that typically takes two academic years to complete, but so too would all of the students who were enrolled in the [University] program as of Spring Quarter 2022 when his suspension began." | If the goal of the suspension was to "ensure that all of the students who were enrolled in the [University] program as of Spring Quarter 2022" would complete the program before I returned to campus, then the total suspension for both violations should have been 5 quarters cumulatively, instead of 7, and ended on June, 2023. This point further supports my claim that I received a disproportionate sanction in both processes. |
| **Grenoble** | **3** | **8** | "I did not have any reason to believe that the journal or the journal entries that included information about the incident in question had been fabricated." | Does not mention why the date of submission or issues about timely access to information I raised at the committee were not discussed by the panel. |
| **Grenoble** | **3** | **8** | Grenoble describes what Inabinet said about Roe 1's journal during and after the hearing. | Fails to mention that Inabinet started the hearing by sharing such information and discussed why he believed the journal to be 'authentic'. |
| **Grenoble** | **3** | **9** | "Both Jane Roe 1 and John Doe stated that John Doe was intoxicated." | In the hearing, I never stated that I was intoxicated. I stated that I had been drinking casually at a professional event earlier in the day and at a social event later in the day; how does Grenoble infer that means I was 'intoxicated'? |
| **Grenoble** | **3** | **10** | "No one else was present at John Doe's apartment when she arrived." | My roommate was in the apartment and Jane Roe knew that and the committee were told that via the investigation report and my verbal testimony. |
| **Grenoble** | **3** | **10** | "Jane Roe 1 saying that she had gone over to John Doe's apartment on the night of the incident in question thinking there would be other people there and that she felt like she had been misled…" | Roe 1 admits in her interview that.."looking back at the messages, she misunderstood what John Doe said at the time and assumed other people would be there." (Pg 50, Inabinet Exhibit A).<br><br>So even after Roe 1 took back her claim that I 'misled' her to my apartment on the night of the alleged incident, the committee chair still remembers the opposite claim, a very irrational, and gender biased point. |
| **Grenoble** | **3** | **10** | "Another is that I recall John Doe saying that he took off Jane Roe's belt during the interaction and saying that he was not able to insert his finger into Jane Roe 1's vagina because she was wearing pants and a belt, but Jane Roe 1 said she did not even own a belt at the time. This stood out to me because it seemed odd to me that someone would not own a belt, but Jane Roe 1 was specific and detailed in her account of the incident..." | The other material event Grenoble recalls is me saying I "took of Jane Roe 1's belt during the interaction…" I never said that in writing or verbally in the hearing. (Pg 12, Inabinet, Exhibit A). I clearly state in my response to the Complaint, "I never removed or undid her belt buckle or removed any of her clothing."<br><br>The fact that two of the three main points Grenoble calls out in her affidavit are factually incorrect give rise to the question if she even read the investigation report. Assuming she did, the only explanation for her manufacturing the facts to fit the narrative she wanted to believe, which supported Jane Roe 1, prove gender bias. |
| **Grenoble** | **3** | **10** | "I found Jane Roe 1's account to be credible given how specific and detailed it was, and I did not find that the clothing she was wearing during the incident meant that John Doe could not have digitally penetrated her." | Lastly, how could Grenoble know what clothing Roe 1 wore the night of the alleged incident? No party submitted pictures or video evidence of the night and Roe 1 did not submit clothing as evidence during the investigation.<br><br>Grenoble, against procedure, allowed Roe 1 to show the committee via zoom the pants that Roe 1 claims she was wearing the night in question. Another instance of how the university deviated from procedure to benefit a female complainant. Roe 1 was allowed to present new evidence, in the middle of the hearing. |
| **Paulus** | **4** | **6** | "At that time, we discussed that John Doe's response to the investigation report was very long and detailed, and noted that Jane Roe 2 had not submitted a response to the investigation report. I also recall that John Doe's response to the investigation report had been submitted only two days prior to the hearing. As a result, we decided to ask Jane Roe 2 if she wanted to verbally respond to the investigative report during the hearing." | What does my optional response only being submitted two days before the Roe 2 hearing have to do with anything? Roe 2 and I were given the same deadline to submit an optional response. |

| Name | Exhibit | Bullet | University Statement | John Doe Response |
|---|---|---|---|---|
| **Paulus** | **4** | **7** | Paulus describes her recollection of the events that transpired at the Roe 2 hearing. | It is true that I admitted to sexual harassment in the Roe 2 hearing, but I made sure to clarify that I was not taking responsibility for sexual abuse and that I felt a preponderance of the evidence standard did not support a finding of that charge. Additionally, I recall mentioning that while my actions may be considered sexual harassment, it did not prevent Roe 2 from having 'equal access to university resources and facilities' as we had no overlapping classes or clubs together. |
| **Paulus** | **4** | **8** | "...the fact that John Doe tried to minimize certain admissions…" | Paulus fails to note what 'certain admissions' I tried to minimize |
| **Paulus** | **4** | **8** | "…the fact that given John Doe's level of intoxication versus Jane Roe 2's sobriety, her recollection was likely to be better than his." | Roe 2 admitted to drinking the night of the alleged incident in the hearing. She said something along the lines of 'she doesn't frequently drink, but did have a couple drinks at the event we were at" - as a result how could Paulus confirm that Roe 2 was sober? Roe 2 never submitted a toxicology report. How could an impartial person take it as 'fact' that Roe 2 was sober solely based on verbal testimony. |
| **Paulus** | **4** | **10** | "Two Committee members were in favor of expulsion, and three members (including Professor Hogan) were in favor of suspension." | Why does Paulus testify to the sanction Mr. Hogan favored, but not the one that Mr. Allen favored? My complaint alleges that Mr. Hogan's internet outage put me at a disadvantage due to the remote format of the hearing; Mr. Allen is who I allege was not fair, impartial, and who made a sarcastic response towards me. |
| **Allen** | **5** | **3** | "I also recall that John Doe had letters from other persons regarding the allegations against him, which may have been shared during the hearing itself (rather than as part of the pre-hearing materials)." | No letters were presented by Roe 2 and myself regarding other allegations. If Mr. Allen is referring to the fact that he was aware of the other disciplinary process I was part of, which all communication was sent via electronic letter, than I believe this proves another one of my point's that these cases were not adjudicated separately and the committee was are of, and relied on information from both investigations to not only find me culpable, but also issue disproportionate sanctions against me. |
| **Allen** | **5** | **4** | "I recall another Committee member raising a concern that we had John Doe's response to the investigative report before us for consideration, but no such response from Jane Roe 2, and we decided to give her an opportunity to share her response to the investigative report during the hearing." | Why was it a 'concern' for the committee that Roe 2 had not submitted an optional response? Why was she given two opportunities to submit a verbal optional response during the hearing? She had the same amount of time that I had to submit an optional response and failed to do so. |
| **Allen** | **5** | **4** | "As I recall, this Committee member rejoined via video using his telephone." | Allen falsely alleges that the committee member joined via video by phone - such member was never on video during the hearing. |
| **Allen** | **5** | **6** | "...whereas Jane Roe 2 was sober and having tea." | Jane Roe 2 admitted to drinking during the night in question to the committee, the event that night was my birthday party and everyone had to pay ~$50 to enter the 'open bar' event. Roe 2 admitted to having drinks that night, so Allen saying she was 'sober' is a false claim based on the information provided. I can assure the court, that 'tea' was not being served at this 'open bar' event. |
| **Allen** | **5** | **6** | "...it seemed unlikely that he would remember as much as he claimed to remember about certain things given that he said he could not recall various other things." | Allen fails to claim what were the "things" that I could not recall that night; I answered every question the committee asked me and the only answer I did not give a direct answer to was in regard to the number of drinks I consumed that night. I provided a range because I honestly could not remember the exact number. |
| **Allen** | **5** | **7** | Allen describes and tries to defend the sarcastic comment he made towards me during the Roe 2 hearing. He also describes why he felt that I was not credible. | Mr. Allen's recollection is false and he is not being truthful in this point. He made a sarcastic comment about my recollection of events after I answered my first question (see Inabinet 2 item 34 above). |
| **Allen** | **5** | **7** | Allen describes and tries to defend the sarcastic comment he made towards me during the Roe 2 hearing. He also describes why he felt that I was not credible. | In point 5, Allen says he does not find me truthful because I was very "careful as to how he answered the Committee's questions", yet in point 7 he tries to defends the sarcastic comment he made towards me by saying the statement did not reflect any bias he had towards me, either personally or as a male, but to point out " significant inconsistencies' in my testimony. He is contradicting himself and opening up for inference that he was not acting as a fair or impartial committee member. |
| **Allen** | **5** | **9** | "In considering sanctions, the Committee considered this prior disciplinary history." | Allen admits that prior disciplinary history was leveraged when considering sanctions |
| **Rasmussen** | **6** | **10** | Rasmussen describes an email exchange that I had with Inabinet contained within my appeal of the Roe 1 hearing outcome. | Unintentional omission due to me having multiple versions of the same document stored on my personal device. Regardless, I state that Inabinet said he would notify all parties, including the Committee of his efforts to vet the journal, which he did not do before the hearing. |

| Name | Exhibit | Bullet | University Statement | John Doe Response |
| --- | --- | --- | --- | --- |
| **Rasmussen** | **6** | **10** | Rasmussen describes an email exchange that I had with Inabinet contained within my appeal of the Roe 1 hearing outcome. | The main point here being that Inabinet refused to remove the journal entries from evidence going to the committee and I wanted to avoid the chance of him supporting the Complainant's evidence. He never replied to the email Rasmussen highlights and thus fails to provide the committee members or myself on the outcome of his 'endeavor' in reviewing the journals in advance of the hearing. |
| **Rasmussen** | **6** | **16** | "I also recall Dean Inabinet informing me that, given the nature of the journal entries, he did not believe that John Doe needed a lot of time to respond to the journal entries. I determined that the information addressed in the journal entries regarding the incident in question was similar to the information regarding this incident that already appeared in the investigation report..." | Why did Inabinet believe that "I did not need a lot of time to respond to the journal entries" ? TO BE CLEAR I RECEIVED NO TIME TO RESPOND TO SUCH JOURNAL ENTRIES in advance of the hearing. Other than her testimony as part of her complaint and interview, Roe 1 submitted zero evidence to be analyzed in the investigation report. |
| **Rasmussen** | **6** | **17** | Rasmussen describes an email exchange that I had with Inabinet contained within my appeal of the Roe 1 hearing outcome. | See point 10 above and I would again like to reiterate that Inabinet never told me or the committee in advance of the hearing what the result of his vetting of the journal was. |
| **Rasmussen** | **6** | **18** | "I recall Dean Inabinet informing me that Jane Roe 1 was out of the country at the time on a study abroad or other similar program, so she asked her roommate or friend to retrieve a journal that Jane Roe 1 said was located in her bedroom."<br><br>"In light of this, I determined that there was not any indication that the journal entries had been fabricated or written on a date other than the dates reflected in the journal entries." | Roe 1 was in Chicago for 2+ months before she left for her abroad program in January 2022. She had ample time to submit these journal entries herself during the investigation if they truly existed - the date of submission should have been a clear indication that such journal entries were not written when the complainant claims they were. A factor that Rasmussen seems to ignore and not consider in her testimony. |
| **Rasmussen** | **6** | **24** | Rasmussen states why she believes Inabinet did not violate the policy or outline governing the Roe 1 hearing in regard to him speaking on the journal entries Roe 1 submitted at the start of the Roe 1 hearing. | Rasmussen fails to acknowledge the main issues with Inabinet's testimony at the start of the hearing. Inabinet gave credence to Roe 1's only tangible piece of evidence and Inabinet failed to mention anything related to the journal that would have diminished its authenticity, such as: 1) the journal not being submitted with Roe 1's complaint or during the 5-month long investigation, 2) Inabinet only seeing the journal via zoom, 3) Inabinet not speaking or giving credence to any of the evidence I submitted. |
| **Rasmussen** | **6** | **32** | "a. John Doe: outcome #1: 4-quarter suspension; outcome #2: 3-quarter suspension (total: 7-quarter suspension)<br><br>b. Respondent A: outcome #1: 3-quarter suspension; outcome #2: expulsion<br><br>c. Respondent B: outcome #1: 3-quarter suspension; outcome #2: expulsion; outcome #3: expulsion<br><br>d. Respondent C: outcome #1: disciplinary probation through graduation; outcome #2: 8-quarter suspension" | Rasmussen falsely compares my charges to Respondents A, B, and C in her affidavit.<br><br>I was only charged with sexual assault (falsely) in the Roe 1 case. In the Roe 2 case I was charged with sexual abuse, which has a very broad definition based on University policy, and sexual harassment, which based on both my interpretation of the policy and pre-investigation discussions with Inabinet was a less serious violation of the policy.<br><br>Respondents A, B, and C all had at least two separate (B had 3) complainants accuse them of sexual assault. No specific case details exist so I cannot argue about the specific allegations versus mine, but I can argue that my charges were different and that I was not accused of sexual assault by two separate complainants. The charges I received as a result of the Roe 2 complaint, were much less severe in nature and not sexual assault. Rasmussen is not referencing accurate comps when comparing my situation to the situations of Respondents A, B, and C. |
| **Cortez-Vazquez** | **7** | **5** | Cortez-Vazquez describes the steps she took to evaluate my appeal of the Roe 2 hearing outcome. | There is a stark difference from including information received relevant to a case and including information that the investigator (Inabinet) knew to be false. Roe 2 never accuses me of sexual assault, her witness claims that I did and that penetration occurred. Roe 2 admits that I never touched her vagina, yet her witness says the opposite. Why did Inabinet include information, he knew to be false in the investigation report? He did so to further bolster the female complainant's narrative and influence a more serious sanction from the committee. |