**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL CASE NO. 1:22−cv−05273** |
| | ) | |
| **v.** | ) | **JUDGE MARTHA M. PACOLD** |
| | ) | |
| **THE UNIVERSITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**AMENDED COMPLAINT AND JURY DEMAND**

---

JOHN DOE (a pseudonym),[1] by his attorneys NESENOFF & MILTENBERG LLP and MICHAEL CHERONIS, ESQ., as and for his Complaint against Defendant University of Chicago, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1. This Title IX discrimination/breach of contract suit is brought on behalf of Plaintiff John Doe ("John Doe"), a now suspended graduate student at Defendant University of Chicago ("University of Chicago") just one course short of his graduation and despite a previously unblemished disciplinary record. John Doe was accused by two fellow female students who had been friends. On November 15, 2020, John Doe and Jane Roe 1 had made out at John Doe's apartment, but did nothing more; yet, one year after the alleged incident, on November 18, 2021, Jane Roe 1 falsely complained that John Doe had forcefully kissed her and engaged non-

[1] Plaintiff John Doe has filed herewith a motion to proceed by pseudonym with respect to John Doe, Jane Roe 1 and Jane Roe 2.

consensually in other sexually aggressive behavior. On October 23, 2021, in the early morning hours, at Jane Roe 2's invitation John Doe went to Jane Doe 2's apartment where Jane Roe 2 told John Doe could spend the night; thereafter, the two "spooned" in Jane Roe 2's bed but did not have sex, John Doe respecting Jane Roe 2's "no," and Jane Roe 2 requested John Doe leave, which he did. On November 5, 2021, John Doe received a formal complaint from Jane Roe 2 falsely accusing John Doe of exposing himself to her, masturbating in front of her, offering her money for sex and engaging non-consensually in sexually inappropriate touching; and John Doe was removed immediately from the leadership positions he had held in the graduate program. Based on what were obviously false accusations without any physical or other corroborating evidence to meet the "more likely than not" preponderance standard, John Doe was found responsible as a result of a "believe the woman" bias and sanctioned to what is an excessive seven quarter suspension and banishment from campus, graduation exercises and campus activities.

## THE PARTIES

2. John Doe is a natural person residing in the State of Illinois. During the events described herein, John Doe was a graduate student at the University of Chicago. John Doe presently lives in Chicago, Illinois.

3. The University of Chicago is a private research university located in Chicago, Illinois with its main campus in Chicago's Hyde Park neighborhood. The University of Chicago is consistently ranked among the best universities in the world and it is among the most selective in the United States. The University of Chicago is composed of an undergraduate college and five graduate research divisions, which contain all of the university's graduate programs and interdisciplinary committees. The University of Chicago has eight professional schools: the Law School, the Booth School of Business, the Pritzker School of Medicine, the Crown Family School

of Social Work, Policy, and Practice, the Harris School of Public Policy, the Divinity School, the Graham School of Continuing Liberal and Professional Studies, and the Pritzker School of Molecular Engineering.

## JURISDICTION AND VENUE

4. This Court has federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (i) the claim brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., herein arises under federal law and is a civil rights non-discrimination statute; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

5. This Court has personal jurisdiction over the University of Chicago on the grounds that University of Chicago is conducting business in the City of Chicago in the State of Illinois.

6. Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A. John Doe – Graduate Student at the University of Chicago.

7. John Doe, prior to the events that took place, was a full-time Graduate student at the University of Chicago expected to graduate in the Spring of 2022.

8. John Doe has one class left to complete prior to graduation and has been suspended for seven () quarters due to the false accusations against him.

9. John Doe was a well-respected and highly regarded member of the University of Chicago community, holding numerous leadership positions in clubs and organizations.

**B. <u>John Doe's Relationship with Jane Doe 1 and the Alleged Incident with Her.</u>**

10. On November 14, 2020, John Doe was contacted by Jane Roe 1, via Instagram message, asking John Doe to invite her to events such as the virtual cooking class that John Doe was then attending.

11. By November 14, 2020, John Doe and Jane Roe 1 had known each other for two months and had become friends. Both would go on to hold leadership positions in student government and diversity organizations on campus. So, by November 14, 2020, John Doe and Jane Roe 1 had a friendship and were not strangers to each other.

12. Throughout the course the night of November 14 and into the early morning hours of November 15, 2020, John Doe and Jane Roe 1 continued to communicate on Instagram and eventually agreed to meet after attending separate social events.

13. Jane Doe 1 accepted John Roe's invitation to his apartment. At the time of the events, John Doe's roommate was in the apartment sleeping.

14. John Doe lived across the street from Jane Roe 1. At his apartment, the two talked and drank for an hour. John Doe offered whiskey to Jane Roe 1, and she accepted.

15. After drinking for the hour, John Doe and Jane Roe 1 began to make-out, John Doe put his hand inside Jane Roe 1's shirt and she removed it, he did not try again. John Doe put his hands on the outside of her pants near her belt buckle, but Jane Roe 1 removed his hand.

16. It was at this time that John Doe verbally asked for consent to progress things forward with Jane Roe 1, but she rejected the request. John Doe did not ask again.

17. Jane Roe 1 then left John Doe's apartment and shortly thereafter, texted him saying she had made it home safely.

18. In her complaint, Jane Roe 1 claimed that in the next text conversation she had with John Doe, she told him she was not comfortable with their encounter.

19. John Doe proved that Jane Roe 1 had lied after submitting the next text conversation they had after the night of alleged incident; Jane Roe 1 reached out to John Doe on November 18, 2020 telling him to be careful because Jane Roe 1 had recently been exposed to COVID-19.

**C. <u>John Doe's Relationship with Jane Doe 2 and the Alleged Incident with Her.</u>**

20. On October 22, 2021, John Doe was celebrating his birthday and had invited Jane Roe 2 to attend the birthday celebration. John Doe and Jane Roe 2 had been friends for over a year, having gone on numerous international and domestic trips together in larger groups.

21. In the early hours of October 23, 2021, Jane Roe 2 invited John Doe over around 1:30 am. John Doe arrived at her apartment around 2:30 am.

22. John Doe and Jane Roe 2 stayed in the kitchen at first where Jane Roe 2 gave John Doe a glass of water. Jane Roe 2 signaled to her bedroom and told John Doe he could stay the night. When John Doe and Jane Roe 2 entered her bedroom, John Doe removed his clothing, keeping his boxers on. There was a vibrator on Jane Roe 2's bed. Jane Roe 2 told John that she uses often her vibrator.

23. John Doe and Jane Roe 2 were cuddling in Jane Roe 2's bed in a spooning position so that John Doe was behind Jane Roe 2.

24. While "spooning," John Doe removed his boxers, perceiving that at this point in time Jane Roe 2 was comfortable with this progression. Jane Roe 2 made a complimentary remark regarding John Doe's penis, continuing to show her comfort with the situation.

25. John Doe tried to pursue further sexual activity by touching Jane Roe 2's butt and then attempted to touch her breasts. At this point, Jane Roe 2 began to tell John Doe about her sexual pleasures including that she likes to be "dominant" with her sexual partners.

26. John Doe then asked Jane Roe 2 if she would have sex, asking several times for consent, but Jane Roe 2 said no. Jane Roe 2 stated that she did not want to continue.

27. After denying John Doe's request to have sex, Jane Roe 2 removed John Doe's clothing from her apartment. At this time, John Doe did not automatically leave, and he asked Jane Roe 2 to retrieve his clothing from the hall, so he did not walk out naked. She did, and John Doe left around 4:00 am.

28. On the night in question, Jane Roe 2's roommate was not home.

29. The following morning, John Doe heard that Jane Roe 2 was feeling uncomfortable about the prior night, and so John Doe texted Jane Roe 2 apologizing for his behavior. John Doe did so not because he had engaged in sexually inappropriate conduct that would meet the definition of sexual harassment or abuse according to the University's policy, but because he wanted to soothe the feelings of a female friend.

**D. <u>The Disciplinary Proceedings.</u>**

**(i) <u>Jane Doe 2 University Complaint.</u>**

30. On November 1, 2021, John Doe received a no-contact order from the Title IX Office on behalf of Jane Roe 2. Plaintiff could not understand the reason for the no-contact order, as there had not been any true sexual aggression. In addition, John Doe and Jane Roe 2 had no overlapping courses together.

31. On November 5, 2021, John Doe received a formal complaint letter from the Title IX Office notifying him that Jane Roe 2 had submitted a formal complaint against him.

32. In the formal complaint, Jane Roe 2 falsely alleged that John Doe had exposed himself to her and masturbated in front of her. Further, she falsely alleged that John Doe offered her money for sexual favors, offering to use the money he had access to for his school organizations to pay for sex. Further, Jane Roe 2 falsely alleged that John Doe non-consensually touched her breasts and butt. Jane Roe 2 claimed that she had to remove forcefully John Doe's clothes from her apartment three times before John Doe left. All these allegations are false.

33. John Doe was said to have allegedly violated the University Policy for "sexual conduct", "sexual abuse", and "sexual harassment." Specifically, as per the investigation report, it was reported that John Doe was accused of trying to convince Jane Roe 2 to engage in unwanted sexual activity, masturbated in front of her, touched her with his penis, and attempted to touch her breast, butt, and genitals. The University conducted the ensuing disciplinary proceeding with respect to Jane Roe 2 pursuant to the University's own non-Title IX Policies against sexual harassment and not pursuant to the Title IX Policies required by federal law. The University did so purportedly because the alleged misconduct occurred in an off-campus apartment and that John Doe was a threat to the University community because of unproven allegations and rumors. The rationale was legally deficient, a pretext for not complying with the due process regulations currently in the Title IX regulations so as to find John Doe responsible for the alleged sexual misconduct.

34. In her report, Jane Roe 2 alleged that she asked on numerous occasions that John Doe leave her apartment to which he responded that her requests "turned him on." She alleged that she threw his clothes and shoes out of the apartment three times before he eventually left. However, Jane Roe 2 did not submit video evidence from her building showing that she removed

John Doe's clothing from her apartment three times, because it never happened. Video evidence would have confirmed Jane Roe 2 had lied and exaggerated her statements.

35. In Jane Roe 2's complaint she included text messages from John Doe which he sent her the morning after their encounter. The text messages consisted of John Doe's apologizing to Jane Roe 2 for his behavior. Jane Roe 2 also included a text conversation that John Doe had with one of her witnesses.

36. The text messages were not shown to John Doe by the investigator until the end of January, six weeks after the deadline to submit additional evidence. When later denying John Doe's request for review appeal, Dean Rassmussen notes the late submission of text messages by Jane Roe 2 as an "administrative delay," and fails to note that John Doe had to raise this issue to the investigator.

37. In numerous of the text conversations included in the complaint and investigation report between Jane Roe 2, Jane Roe 2's friends, and John Doe, John Doe is baselessly accused of sexually assaulting multiple women. The friend saying specifically that "multiple women say you've done this" about sexually assaulting them.

38. As per the investigation report, since the alleged incident John Doe has seen two psychologists and a psychiatrist, had fully removed himself from the University's campus, completed numerous alcohol and sexual harassment trainings, and refrained from contacting Jane Roe 2 or being in the same vicinity as her.

39. John Doe was diagnosed with generalized anxiety disorder and major depressive disorder in February of 2022.

40. As a result of Jane Roe 2's formal complaint, John Doe was removed from all leadership positions he had held on campus. Further, John Doe was banned from attending or

participating in any University clubs or organizations which he was a part of and could not attend any University related trips; despite having already paid to attend certain trips.

41. Due to the "supportive measures" that were given to Jane Roe 2 from her original complaint, on November 15, 2021, John Doe was removed from all leadership positions he held, resulting in him having to miss a vital event that was hosted by his future employer.

42. That same day, John Doe met with Dean Inabinet, the Associate Dean of Students for Disciplinary Affairs, for the first time to discuss the charges and the disciplinary process and to answer John Doe's preliminary questions.

43. In the formal investigation report, Dean Inabinet's interview with Jane Roe 2 is summarized. Jane Roe 2 falsely told Dean Inabinet that within 15 minutes of John Doe being in her apartment he began to masturbate in her bedroom.

44. Jane Roe 2 further told Dean Inabinet that John Doe did not seem drunk and did not smell of alcohol, although saying previously that at his birthday party a few hours before John Doe had seemed inebriated.

45. In the interview, Jane Roe 2 told Dean Inabinet that John Doe made many sexual advances towards her while he was fully naked in her bedroom. Such advances constituted his penis brushing her legs, Doe being fully naked on top of Roe 2, and touching Roe's breast through her clothes while he was naked.

46. Jane Roe 2 admitted to there being a vibrator on her bed at the time of the incident but asserted that the reason for her vibrator being there was because she was not expecting visitors and did not expect John Doe to be in her bedroom. John Doe claimed the reason for the vibrator being on her bed was because she used that to tell John Doe what she was sexually into.

47. Jane Roe 2 denied that she and John Doe were spooning like he said they were and that the two of them were on their backs for the majority of the time they were on her bed. Witness interviews from the investigation report detail how the night before the incident with Jane Roe 2, John Doe had a confrontation with one of her friends. The reason for Jane Roe 2 and John Doe texting after his party was due to Jane Roe 2 confronting him for his behavior the night before. The witness said that John Doe tried to invite Jane Roe 2 to his apartment first but she would not go and simply invited him to her apartment while she made food.

**(ii) <u>Jane Doe 1 University Complaint.</u>**

48. On November 18, 2021, a full year after the alleged incident with Jane Roe 1, John Doe received a formal complaint letter from the Title IX Office notifying John Doe that Jane Roe 1 had submitted a formal complaint against John Doe. Throughout the entire year prior to Jane Roe 1's formal complaint, Jane Roe 1 and John Doe had remained friends and had texted and spent time in groups together on numerous occasions. John Doe had no reason to assume anything was wrong with the encounter on November 15, 2020.

49. As detailed in the formal investigation report, John Doe was accused of violating the University Policy on Harassment, Discrimination, and Sexual Misconduct. John Doe was specifically accused of violating the policies on "sexual conduct," "sexual abuse," "sexual penetration," "sexual assault," and "sexual harassment." . The University conducted the ensuing disciplinary proceeding with respect to Jane Roe 1 pursuant to the University's own non-Title IX Policies against sexual harassment and not pursuant to the Title IX Policies required by federal law. The University did so purportedly because the alleged misconduct occurred in an off-campus apartment and that John Doe was a threat to the University community because of unproven allegations and rumors. The rationale was legally deficient, a pretext for not complying with the

due process regulations currently in the Title IX regulations o as to find John Doe responsible for the alleged sexual misconduct.

50. Between November 2020 when the alleged incident with Jane Roe 1 occurred and November 2021 when Jane Roe 1's complaint was filed, Jane Roe 1 and John Doe had engaged in numerous texting conversations initiated by Jane Roe 1 that were friendly and cordial. Further, Jane Roe 1 and John Doe had attended numerous events together, Jane Roe 1 having been in John Doe's apartment at least three times for parties since the alleged incident.

51. In Jane Roe 1's complaint, she falsely alleged that John Doe forcefully kissed her, that John Doe forced her to touch his penis, and that John Doe touched her vagina. Further, Jane Roe 1 alleged in the complaint that John Doe put his hand on her throat and pushed her up against a door while they were making out.

52. Specifically, Jane Roe 1, as per the formal investigation report, claimed that John Doe engaged in "Unwelcome sexual conversation," "asked Jane Roe 1 to perform sexual activities with him" repeatedly, "forced [Jane Roe 1] to touch his bare penis," "forced [Jane Roe 1] to kiss him," "applied pressure [Jane Roe 1]'s throat with his hands," and "forced his hand inside of [Jane Roe 1]'s underwear and penetrated her vagina with his fingers."

53. Jane Roe 1 further falsely claimed that she was brought to John Doe's apartment under false pretenses, that he was hosting a party instead of inviting her alone.

54. Jane Roe 1 claimed in her complaint and, according to the investigation report, to the investigator that John Doe forced her to kiss him and would not let her leave without kissing him. Further, despite the fact that Roe 1 and John Doe had been friends prior to the incident and remained friends afterwards, Roe 1 claimed that John Doe told her he had only hung out with her in the past with the intention of being more than friends.

55. Jane Roe 1 claimed that John Doe asked her about his penis size, something that Jane Roe 2 had also asserted in her complaint and investigation. As this was a false assertion, it is upon information and belief that Jane Roe 1 took this information from Jane Roe 2.

56. Jane Roe 1 asserted that after the altercation, John Doe texted her asking her to come over again and she replied that it was never going to happen. There is no proof of this exchange taking place; there are no text messages to show that this alleged conversation occurred.

57. Jane Roe 1 failed to mention in her complaint or throughout the investigation that she and Doe had spoken via text and in person numerous times between the alleged incident and the investigation report.

**(iii) <u>John Doe's Denials of Complaints.</u>**

58. With respect to the Jane Roe 1 complaint, on November 20, 2021, John Doe canceled a school trip to Mexico City he had planned to attend in order to avoid Jane Roe 1. Plaintiff had not received a no-contact directive against Jane Roe 1 but felt that given the weight of the situation and the falsity of the claim, the best course of action would be to forgo going on the trip.

59. After grappling on his own with how to move forward, John Doe met with Dean Inabinet for a second time on November 22, 2021, to discuss the process now that there were two complaints against him.

60. On December 15, 2021, John Doe submitted his response to both complaints. John Doe addressed the allegations of Jane Roe 1 and Jane Roe 2 and denied their false allegations.

61. On January 25, 2022, John Doe reached out to Dean Inabinet to talk about issues he was having with the charges he was given as a result of the complaints. In Dean Inabinet's response, he stated "we review the written complaint we received and determine all the possible

policy violations (allegations) based on giving the information in the complaint 100% weight." John Doe argued that by giving the complaint 100% weight with no tangible evidence at the time of submission, was subjecting him to not only a gender biased process, but also inflicting irreparable reputational damage to him. Dean Inabinet's statement was an expression of "Believe the Woman" gender bias.

62. A few months later, on February 2, 2022, John Doe met with Dean Inabinet again to talk about his issues with how the process had been handled. John Doe also met with Dean Inabinet in order to discuss the charges Dean Inabinet had given John Doe in the Jane Roe 1 investigation. This interview was not recorded even though John Doe had requested that all meetings with Dean Inabinet, including his interviews be recorded. Dean Inabinet told him that this was against the University's policy and that no meetings related to the investigation, the interviews, or the hearing itself would be recorded.

**(iv) Investigations.**

63. On February 9, 2022, John Doe had his interviews for both the Jane Doe 2 and Jane Roe 1 hearings.

64. As per the investigation report, John Doe showed messages between him and Jane Roe 1 which Jane Roe 1 had initiated after the alleged incident. From a text exchange from March 30, 2021, Jane Roe 1 messaged Doe a photo of him with the caption "while I was looking for a photo I came across this and it made me smile so I thought I'd share."

65. The exchange on March 30, 2021 was only one of many friendly text exchanges between the two which took place in the year between the alleged incident and the investigation report.

66. In her interview with Dean Inabinet, Jane Roe 1 claimed that John Doe tried to penetrate her and afterwards asked if she “liked that.” However, according to John Doe, there had been no penetration that occurred during their encounter.

67. As stated in one of the witness interviews, it was only after Jane Roe 1 had heard of other women accusing John Doe of assault that she decided she should file a report.

68. The formal request for interview from the University stated that names of individuals to be interviewed were to be submitted at the time of the interview. John Doe was nevertheless given an additional week to provide witness names who could support his claims, and he complied with that time deadline.

69. Complainants Jane Roe 1 and Jane Roe 2 were given significantly more time to secure witnesses. Both Jane Roe 1 and Jane Roe 2 had their interviews by early January, 2022, yet the individuals they requested to be interviewed were not contacted until the end of February or early March 2022. This difference resulted because the investigator, Dean Inabinet, was biased throughout the process.

70. After John Doe’s interview, he reached out to the University’s Title IX Coordinator, Bridget Collier, to discuss questions and issues he had. John Doe asserted that the mislabeled “supportive measures” inflicted on him as a result of both complaints, such as being removed from leadership positions, not being able to attend University events, etc., were violating University policy because they were punitive in nature and having financial impacts on John Doe.

71. Bridget Collier responded and noted that her office had cited the incorrect provision in the policy and that “emergency removals,” not “supportive measures” should have been referenced.

72. John Doe asked Title IX Coordinator Bridget Collier to state what factors were taken into consideration in the individualized safety and risk analysis that her office supposedly performed in determining the so called "supportive measures." Ms. Collier stated they were a result of the alleged conduct and multiple investigations. When John Doe replied to Ms. Collier and noted that he was banned from attending University sponsored trips and events and forced to step down from all of his leadership positions when there was only one complaint, he never received a follow-up response from Ms. Collier. No response was forthcoming from Ms. Collier because there was no non-discriminatory justification for the treatment of John Doe. The response of Ms. Collier and then the non-response of Ms. Collier reflected the gender bias that John Doe faced.

73. When John Doe received access to the investigation report for Jane Roe 1's complaint, John Doe's name was incorrectly replaced by the name of another minority male student going through the disciplinary process.

**(v) <u>Pre-Hearing Meeting.</u>**

74. The Pre-Hearing Meetings that John Doe had for both complaints took place on March 22, 2022.

75. It was on March 22, 2022, during the Pre-Hearing Meeting for Jane Roe 1's case that John Doe was made aware that Jane Roe 1 submitted additional evidence in the form of diary entries which she claimed to have written around six weeks after the alleged incident on November 15, 2020. Jane Roe 1 had never made mention of the journal diary entries beforehand in the five-month long investigation. Per University policy, evidence available and relevant to a complaint is supposed to be submitted at the time of the complaint. If Jane Roe 1 had actually written these journal entries when she claimed, Jane Roe 1 would have been able to submit them at the time of

her complaint or during the five-month long investigation. She did not. The journal entries were made up near the time of the hearing so as to have the appearance of some evidence in a case that otherwise had no supporting evidence other than Jane Roe 1's say-so. The investigator's acceptance of the manufactured "evidence" of the purported journal entries effectively allowed Jane Roe 1 to get the last say on evidence going the Committee hearing this case. This irregularity of the investigator effectively assisting Jane Roe 1 in the manufacture of false evidence was reflective of gender bias afflicting the disciplinary proceeding.

76. John Doe was only made privy to Jane Roe 1's purported diary entries three days prior to the hearing. John Doe raised his issues and concerns to the investigator at the Pre-Hearing Meeting, but investigator Dean Inabinet did not address John Doe's concerns.

**(vi) <u>Jane Roe 1 Case Hearing.</u>**

77. On March 25, 2022, John Doe had his hearing for the Jane Roe 1 complaint. The hearing was not transcribed or otherwise recorded.

78. The hearing began with introductions and then, before Jane Roe 1 spoke, investigator Dean Inabinet brought up the purported journal entries recently submitted by Jane Roe 1 and discussed how he had vetted those journal entries -- he never physically touched the journal but was shown them via Zoom by a third party not involved in the case, which was a deficient procedure for vetting the purported journal entries. Dean Inabinet thus gave a legitimacy to the purported journal entries that improperly gave evidentiary weight to them when instead, the purported journal entries should have been been viewed with suspicion requiring Jane Roe 1 to explain why she had managed ot 'forget" them during the many months of the investigation and only remembered them near in time to the scheduled hearing on her complaint at a time Jane Roe

1 needed evidence to substantiate her claims more than her say-so. The Hearing Committee did not ask any questions about his vetting of the purported journal entries.

79. Jane Roe 1 then went made a statement, saying that the make-out at John Doe's apartment was consensual, contradicting her statement from the original complaint that John Doe had forcefully kissed her. Jane Roe also asserted that she may have misunderstood the text messages between John Doe and Jane Roe 1 on the night in question, saying that she believed that John Doe was having a party but admitted the text messages did not imply that John Doe was having a party. Jane Doe showed the pants she wore the night in question, and she said she forgot about the journal entries that were under her bed, which Jane Roe 1 said was why she did not submit them until the last minute before the hearing. The Committee hearing panel asked Jane Roe 1 why she kept in contact with John Doe, and Jane Roe 1 said she was faking it because John Doe had social and organizational power over her. Jane Roe 1 then started crying, and the Committee hearing panel stopped asking questions. Later, in her closing, Jane Roe 1 made an emotional pitch without analyzing the facts.

80. John Doe said that on the night in question, November 14-15, 2020, at his apartment, the making-out that Jane Roe 1 and John Doe did was consensual and that John Doe respected Jane Roe 1's setting of limits on further sexual activity. John Doe noted that thereafter , he and Jane Roe 1 stayed in contact without any hint of an issue about the night of November 14-15, 2020. The Committee hearing panel's focus with John Doe, however, was on how much alcohol did he drink, pressing as to what range to the drinking. These questions were not asked of Jane Roe 1.

81. On March 29, 2022, John Doe was found responsible for sexual misconduct in Jane Roe 1's case, and he received a four-quarter suspension. Without the purported journal entries, there was no evidence supporting finding John Doe responsible in Jane Roe 1's case.

82. In the outcome letter John Doe received from the Committee hearing panel in the Jane Roe 1 case, the Committee wrote that the Committee found Jane Roe to be more credible due to Jane Doe 1's purported journal entries. The investigator, Dean Inabinet, had commenced the hearing describing to the hearing panel as to how he vetted the purported journal entries, which he claimed to do via video conference from a 3rd party not involved in the process, and why he believed the purported journal entries was valid evidence for them to assess. Dean Inabinet failed to note that Jane Roe 1 should have submitted this evidence earlier in order to be properly vetted by the University and John Doe. Furthermore, Dean Inabinet did not speak to any of the 40+ pages of text messages and evidence that John Doe submitted to support his innocence.

**(vii) <u>Jane Roe 2 Case Hearing.</u>**

83. On March 31, 2022, John Doe attended the Jane Roe 2 Hearing. The hearing was not transcribed or otherwise recorded. John Doe had asked for this hearing to be in person; yet despite the fact that all COVID-19 protocols had been lifted, the University did not allow this to occur and forced the hearing to be virtual.

84. The hearing began with introductions and Jane Roe 2 and John Doe giving summaries of what they said happened. Upon the conclusion of John Doe's summary, one of the Committee hearing panel members Michael Allen sarcastically commented that John Doe had a great memory for someone who had drank so much.

85. In the hearing on Jane Roe 2's complaint, one of the Committee hearing panel members joined the hearing thirty minutes late and was not on video during the entire hearing.

John Doe does not remember this committee hearing panel member even asking a question during the entire hearing.

86. Jane Roe 2 had not submitted an optional response to the investigation report, but during the hearing, two different Committee hearing panel members acted with bias towards John Doe, making efforts to help Jane Roe 2 fortify her case by asking her if there were any changes to the investigation report she would make while being hostile to John Doe.

87. Susanne Paulus, the faculty chair, asked Jane Roe 2 at the hearing if there was any additional statement she wanted to make since she had not submitted an optional response, and Susanne Paulus further gave Jane Roe 2 the ability to present additional testimony. John Doe was not afforded this same opportunity and therefore was shown gender bias at the hands of the faculty chair.

88. Michael Allen, another faculty Committee hearing member, allowed Jane Roe 2 to discuss changes she would have made to the investigation report since she did not submit an optional response. Michael Allen further made sarcastic and ill-spirited remarks towards John Doe regarding his recollection of the events from the night in question. His remarks and the tone with which they were made depicted gender bias towards John Doe.

89. On April 6, 2022, John Doe was found responsible for sexual harassment and abuse. In the outcome letter for the Jane Doe 2 hearing, the Committee claimed that the Committee found Jane Doe 2 to be more credible than John Doe because John Doe was likely “impaired from alcohol.”

90. Jane Doe 2 claimed in the hearing that she never drinks alcohol – yet admitted that she had been drinking that night and invited John Doe over at 2:30 AM to only “hang out.” Both

parties admitted to drinking that night, yet John Doe was found less credible than Jane Doe 2 solely to gender bias.

91. At the hearing, Jane Roe 2 asked that John Doe be expelled.

92. John Doe was found responsible for sexual misconduct, and he received a three-quarter suspension, banishment from the campus, banishment from graduation exercises and banishment from joining any clubs and holding any campus leadership positions.

93. In total for the Jane Roe 1 and Jane Roe 2 cases, John Doe was suspended for seven quarters, which is equivalent to a year and a half of school, and was further subject to banishment from the campus and school activities.

**(viii) <u>Requests for Review Appeal: Jane Roe 1 Case.</u>**

94. On April 18, 2022, John Doe met with Dean Rasmussen, the Dean of Students, to discuss the request for review appeal process.

95. On April 21, 2022, John Doe filed an appeal request for review of the finding of responsibility and sanction in Jane Roe 1's case. John Doe asserted in his appeal that procedures described in the University-wide Disciplinary Committee Proceedings outline were not followed.

96. John Doe argued that the investigator for the Jane Roe 1 case volunteered testimony that put emphasis on purported journal entries submitted late by Jane Roe 1 near in time to the hearing to provide the appearance of evidence when there was none. Further, the investigator omitted certain facts that would have helped to show John Doe's innocence. The investigator failed to note to the Committee that, among other things, other than the purported journal entries, which had not been submitted during the five-month long investigation, Jane Roe 1 submitted no tangible evidence and admitted to the investigator she has no evidence. John Doe asserted that despite the

investigation into Jane Roe 1's complaint being completed, the investigator continued to pursue the claim and allowed additional purported evidence contrary to University policy.

97. The inclusion of Jane Roe 1's purported journal entries, which were submitted as her optional response, were contrary to University policy that does not allow for the continued pursuit of a claim after the investigation has been completed. By accepting the purported journal entries, the investigator went against said policy. Further, the purported journal entries gave the appearance of proof that Jane Roe 1 otherwise did not have,

98. By accepting Jane Roe 1's purported journal entries, gender bias was at work because the investigator materially helped the female complainant's case in a way contrary to University procedure and contrary to a commonsense assessment of the situation -- if Jane Roe 1 had actually written these journal entries when she claimed, Jane Roe 1 would have been able to submit them at the time of her complaint or during the five-month long investigation, but she did not.

99. The investigator did not tell John Doe that he had accepted late Jane Roe 1's purported journal or disclosed that he would raise the purported journal entries as evidence at the hearing. John Doe asserted in his request for review appeal that this showed gender bias and prejudice against him.

100. Further, John Doe's appeal stated that the sanction he was given in the Jane Roe 1 case, a four-quarter suspension, was excessive. The University has provided statistics for disciplinary violation sanctions and based on these statistics; no graduate student has received more than a three-quarter suspension over the past four years. The excessive sanction here reflected further the gender bias being displayed in this proceeding.

101. On April 29, 2022, John Doe heard back regarding his appeal request for review of the Jane Roe 1 case. Dean Rasmussen stated that John Doe's request for review did not meet the criteria for convening a review board for reconsideration. Dean Rassmussen selectively addressed John Doe's arguments in her response and per University policy, John Doe had no other options for appealing the decision. The appeal decision reflected that the appeal process at the University of Chicago is a sham process.

**(ix) <u>Requests for Review Appeal: Jane Roe 2 Case.</u>**

102. On May 13, 2022, John Doe filed an appeal of the determination of responsibility and sanction in Jane Roe 2's case. John Doe asserted in his appeal request for review that the prescribed procedures in University protocol were not followed and that his sanction was disproportionate to the violation.

103. On May 13, 2022, Dean Belinda Vazquez was assigned to evaluate the request for review appeal in Jane Roe 2's case.

104. John Doe asserted in his request for review appeal in Jane Roe 2's case that the University went against proper procedure when they did not allow for his attorney to contact complainant to offer alternative resolution methods, despite it being listed as a proper protocol in their procedures.

105. John Doe further asserted that he did not receive the actual complaint from that Jane Roe 2 submitted until six weeks after his response was due.

106. John Doe claimed that Dean Inabinet along with the University withheld information and evidence from him that they received at the time the Jane Doe 2 complaint was submitted which put him at a disadvantage in the investigation.

107. The request details how there were many deviations from prescribed procedures detailed in Section 18 of the Policy, Required Training for Policy Personnel outline at the University.

108. Dean Inabinet incorporated false witness statements to improve the credibility of Jane Roe 2. Dean Inabinet was meant to be impartial but clearly acted with gender bias in this way.

109. University policy states that the complainant and respondent should hear about the outcome of the case within five business days of the hearing. John Doe did not hear about the decision for fourteen business days which disadvantaged him greatly. By the time John Doe had heard about the outcome the suspension he was given went into effect the same day and delayed his appeal by another nine days.

110. John Doe further asserted in his request for review appeal that the sanction he was given was disproportionate to the violation. Here, John Doe received a three-quarter suspension on top of the four-quarter suspension he had received for Jane Roe 1's case. As John Doe correctly asserted, the previous four-quarter suspension from Jane Roe 1 should not have been used to increase his sanction for the case of Jane Roe 2.

111. On May 27, 2022, Dean Vazquez responded to John Doe's request for review appeal stating that again, John Doe did not meet the criteria to set up a review board and reconsider his case. Dean Vazquez selectively addressed John Doe's arguments in his appeal, and again John Doe had no other options within the University to appeal the decision. The appeal decision reflected that the appeal process at the University of Chicago is a sham process.

**FIRST CAUSE OF ACTION:**
**(Violation of Title IX of the Education Amendments of 1972)**

112. John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

**A. Title IX and Its Application.**

113. Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

114. Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of an activity such as school sports.

115. The University of Chicago has received federal funding and accordingly maintained a Title IX office as part of the school.

116. Title IX's non-discrimination provision applies to the recipient Luther College regardless of whether the school purports to apply Title IX procedures or other procedures in a disciplinary proceeding. Students discriminated against on the basis of sex by a school's disciplinary measures applied the student have a claim under Title IX.

117. Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

118. "Title IX bars the imposition of university discipline where gender is a motivating factor." *Yusuf v. Vassar*, 35 F.3d 709, 715 (2d Cir. 1994). While some Circuits analyze Title IX

claims under either erroneous outcome or selective enforcement theories, the Eighth Circuit in *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020), followed the Seventh Circuit's standard in *Doe v. Purdue* of simply determining whether "the University disciplined him on the basis of sex -- that is, because he is a male."

119. In *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d at 864-866, the Eighth Circuit upheld the Complaint because the disciplinary decision was against the substantial weight of evidence, the sanction did not match the alleged violation, and the university faced external pressure to aggressively pursue complaints against males. In support of the statement that "External pressure on a university to demonstrate that it acted vigorously in response to complaints by female students may support an inference that a university is biased based on sex, although not necessarily in a particular case," the Eighth Circuit cited a list of cases: *Doe v. Baum*, 903 F.3d 575, 585-86 (6th Cir. 2018), *Doe v. Miami*, 882 F.3d 579, 592-93 (6th Cir. 2018), *Doe v. Columbia*, 831 F.3d 46, 57 (2d Cir. 2016), *Yusuf v. Vassar College*, 35 F.3d 709 715 (2d Cir. 1994), and *Doe v. Purdue*, 928 F.3d at 668-669.

## B. The "Backdrop" Of the Old Regulatory Regime: Starting In 2011, the Federal Government Pressured Educational Institutions to Provide More Protection to Students Alleging Sexual Assault On The Basis Of Protecting Women.

121. Starting in 2011, the federal government began to take aggressive steps to combat what it viewed as an epidemic of sexual assault on college campuses. On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S. Department of Education ("DOE") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter"). The "April 2011 Dear Colleague Letter," while now revoked, was in effect when Columbia's disciplinary procedures were put in place and the alleged sexual assault occurred in this case. Before the 2011 Dear Colleague Letter, colleges and universities generally did not use

its disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the April 2011 Dear Colleague Letter. The April 2011 Dear Colleague Letter thus provides a necessary set of background facts to this action: http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

122. Although the April 2011 Dear Colleague Letter marked a substantial change in OCR's position on how schools should handle disciplinary proceedings under Title IX, OCR did not conduct the public notice and comment process required for proposed regulations. See 5 U.S.C. § 553. The 2011 Dear Colleague Letter (p. 1) defined discrimination on the basis of sex to include sexual harassment of students, which was defined to include acts of sexual violence. The April 2011 Dear Colleague Letter provided that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct.

123. The press release announcing the April 2011 Dear Colleague Letter stated that it was "the first specifically advising schools, colleges and universities that their responsibilities under Title IX include protecting students from sexual violence" and that it included "new steps to help our nation's schools, universities and colleges end the cycle of sexual violence on campus." The press release made clear the focus was on protecting women: it stated that despite past progress "the threat of violence and abuse continues for a new generation of women"; it lauded the "unprecedented coordination and cooperation across the federal government to combat violence against women"; it stated that one in five women "will be a victim of sexual assault during college" (a statistic that would later be thoroughly discredited that, if had it been true, would represent triple the rate of rape for the same demographic in war-torn Somalia)[2]; and it highlighted "the

[2] Somalia Human Development Report, UN Development Programme, 2012, Table A4-28.

Administration's commitment to raising awareness and promoting policies to prevent sexual violence against women of all ages."

124. The April 2011 Dear Colleague Letter itself explicitly focused on protection of women and effectively equated "victims" and "complainants" in sexual misconduct proceedings as women who must receive preferential treatment. For instance, the April 2011 Dear Colleague Letter: (i) stated -- incorrectly -- that "1 in 5 women are victims of completed or attempted sexual assault while in college" (p. 2); (ii) warned that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol" (p. 2); (iii) suggested educational institutions seek grants from the U.S. Department of Justice's Office on Violence against Women, which require institutions to "develop victim service programs and campus policies that ensure victim safety, [and] offender accountability . . ." (p. 19); and (iv) warned educational institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs" and asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs (p. 15).

125. The 1 in 5 "statistic" cited by the April 2011 Dear Colleague Letter came from a disputed 2007 study, which was based on an overly broad definition of sexual assault and which, according to the study authors, was not derived from a nationally representative sample. Schow, "No, 1 in 5 Women Have Not Been Raped on College Campuses," Washington Examiner, August 13, 2014, http://www.washingtonexaminer.com/no-1-5-women-have-not-been-raped-on-college-campuses/articles/2551980.

126. Bureau of Justice Statistics (DOJ) study, 1995-2013, published in December 2014 found that college-age female students on campus were less likely to be victims of sexual assault

than non-students and the real number of college women assault victims is .03 in 5; these statistics do not support the notion of a "crisis" of violence against women. Rape and Sexual Assault Victimization among College Age Females, 1995-2013 (Special Report), U.S. Department of Justice, December 2014, http://www.bjs.gov.content/pub/pdf/ravcaf9513.pdf.

127. The April 2011 Dear Colleague Letter, in order to provide females what was unjustified preferential treatment, imposed numerous mandates that inherently made it more difficult for males accused of sexual misconduct to defend themselves. The "April 2011 Dear Colleague Letter" (pp. 10-11) required schools to adopt a relatively low burden of proof -- the preponderance of the evidence ("more likely than not") -- in cases involving sexual misconduct, including sexual assault. Several colleges had been using "clear and convincing," and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt." The April 2011 Dear Colleague Letter (p. 12) also strongly discouraged allowing cross-examination of complainants because it "may be traumatic or intimidating" to the alleged victim. The "April 2011 Dear Colleague Letter" stated (p. 12) that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the April 2011 Dear Colleague Letter was published, schools changed their sexual assault and sexual harassment policies and procedures. Additionally, the "April 2011 Dear Colleague Letter" stated (pp. 15-16) that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

128. On April 29, 2014, the OCR published a document signed by then Assistant Secretary of Education in charge of the OCR Catherine E. Lhamon ("Secretary Lhamon") and bearing the title "Questions and Answers on Title IX and Sexual Violence." (the "2014 Q&A"): http://www2.ed/gov./about/offices/list/ocr/docs/qa-201404-title-ix.pdf. The 2014 Q&A

continued OCR's effort to restrict students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. For example, OCR's 2014 Q&A states that schools: (i) "must not require a complainant to be present" at sexual misconduct disciplinary hearings" (p. 30); (ii) may decide to eliminate all opportunities for "cross-examination" (p. 31); and (iii) must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 38).

129. Neither OCR's April 2014 Q&A nor the April 2011 Dear Colleague Letter were subject to notice-and-comment rule-making, yet both the OCR's April 2014 Q&A and the April 2011 Dear Colleague Letter constituted substantive decision-making.

130. In a letter dated December 30, 2014, the OCR informed the Harvard Law School that the sexual misconduct policy it continued to use after issuance of the April 2011 Dear Colleague Letter "improperly used a 'clear and convincing' evidence standard of proof in its Title IX grievance procedures, in violation of Title IX." (Emphasis in original.) The OCR letter stated that the higher clear and convincing standard of proof was inconsistent with preponderance of the evidence standard required by Title IX for investigating allegations of sexual harassment or violence and directed the Harvard Law School, by January 15, 2015, to adopt procedures "that comply with the applicable Title IX regulations and OCR policy," which procedures must include "[a]n explicit statement that the preponderance of evidence standard will be used for investigating allegations of sexual harassment or violence." https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf. Other schools, including State University of New York-Buffalo and Princeton University, were required by the OCR to use the preponderance of the evidence standard in adjudicating sexual misconduct cases.

131. Prior to 2011 Dear Colleague guidance, schools were not required to adjudicate sexual harassment claims, which Dept. of Education had identified as "the exclusive province of the police and...the [local] district attorney."[3] OCR invited --indeed demanded -- that schools take on this authority and use it in accordance with their official (but not statutory) guidance, under pain of Federal investigation that would incur reputational harm, legal fees, not to mention possible loss of Federal grants.[4] Thus, this guidance effectively mandated schools public and private to exercise this function.

132. The April 2011 Dear Colleague Letter and April 2014 Q&A led colleges and universities to devise victim centered procedures for adjudicating sexual assault that are not neutral and impartial; and the reality is that males are almost always the "accused" respondents and females are almost always the "victim" complainants. Almost all complainants are females and almost all respondents are males. A study by United Educators showed 99% of the accused are male. "Confronting Campus Sexual Assault: An Examination of Higher Education Claims," https://web.archive.org/web/201701225139/https://www.ue.org.UploadedFiles/Confronting%20Campus%20Sexual%20Assault.pdf.

133. While the April 2011 Dear Colleague Letter reaffirmed in principle that both accusers and accused have the right to have a prompt and equitable resolution, including the right to an adequate, reliable, and impartial investigation, similar and timely access to any information that will be used at the hearing and adequately trained fact-finders and decision makers, the April 2011 Dear Colleague Letter also, however, contained other provisions which expanded the nature and scope of schools' responsibility to address sexual misconduct, essentially compelling them to

[3] *Brentwood Acad. v. TN Secondary School Athletic Association*, 531 U.S. 288, 302–03 (2001).
[4] Privatization and State Action: Do Campus Sexual Assault Hearings Violate Due Process?, TX. L. Rev. 96:15 (2017), Jed Rubenfeld, pg. 20-21, 48.

choose between fundamental fairness for students and continued federal funding. These provisions are not required by Title IX and are not consistent with legal precedent and due process.

134. Among other things, the April 2011 Dear Colleague Letter defined sexual harassment broadly as "unwelcome conduct of a sexual nature," conflating cases based on conduct with cases based on speech; stated that "mediation is not appropriate even on a voluntary basis" in cases involving alleged sexual assault; directed schools to ensure "steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant"; directed schools to take interim steps to protect complainants and "minimize the burden on the complainant"; "strongly discourage[d]" schools from allowing cross-examination of parties; and urged schools to focus on victim advocacy.

135. Even though the April 2011 Dear Colleague Letter purported to be a "guidance" document and did not go through rule-making procedures, OCR framed many of its directives as mandatory. Moreover, the letter contained an explicit threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation."

136. The overriding purpose of the April 2011 Dear Colleague Letter was "to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response," and OCR "demand[ed] that universities do so or face a loss of federal funding." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D. Mass. 2016). As the Brandeis court observed, while "[t]he goal of reducing sexual assault, and providing appropriate discipline for offenders, is certainly laudable," the effect of the letter was "the elimination of basic

procedural protections—and the substantially increased risk that innocent students will be punished."

137. The April 2011 Dear Colleague Letter has been described as the "first warning shot" that OCR intended to punish any school that failed to handle sexual assault proceedings as OCR wanted.

138. After the 2011 Dear Colleague Letter, the federal government continued to pressure colleges to deal aggressively with reported sexual assaults, to adopt procedures that do not safeguard the rights of the accused, and to start with the presumption that a complainant is telling the truth.

139. In 2014, OCR released additional guidance in which it reiterated many of the directives set forth in the April 2011 Dear Colleague Letter, including the directive to "ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant." In addition, OCR advised schools to give employees and students "trauma-informed" training and said, "hearings should be conducted in a manner that does not inflict additional trauma on the complainant."

140. The same year, a White House Task Force was created, co-chaired by the Office of the Vice President and the White House Council on Women and Girls. The Task Force continued the government's focus on protection of women, with a mission "to tell sexual assault survivors that they are not alone" and "help schools live up to their obligation to protect students from sexual violence."

141. The Task Force's first report opened with the claim that "[o]ne in five women is sexually assaulted in college," stated that the federal government was ramping up Title IX

enforcement efforts, and stressed again that schools found in violation of Title IX risked losing federal funding.

142. The Task Force also pressed colleges and universities to provide "trauma-informed" training for their officials, stating that "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable."

143. The report stated that the Justice Department, through its Center for Campus Public Safety and its Office on Violence Against Women, was developing trauma-informed training programs.

144. Ultimately, the Justice Department funded a "Start by Believing" campaign under which investigators are trained to investigate cases from an initial presumption of guilt and write reports "that successfully support the prosecution of sexual assault cases." End Violence Against Women International, Effective Report Writing: Using the Language of Non-consensual Sex, at 5, https://www.evawintl.org/library/DocumentLibraryHandler.ashx?id=43; see also Campus Action Kit, Start by Believing, https://www.startbybelieving.org/wp-content/uploads/2018/08/Campus-Action-Kit.pdf.

145. Among other things, "Start by Believing" training direct investigators to "recreate the entire reality of the sexual assault from the perspective of the victim." "Start by Believing" training tells investigators: "By writing the report to recreate the reality of the sexual assault and refute potential defense strategies, investigators can greatly increase the likelihood that charges will be filed in the case and it will result in a conviction. They may even help to make this process faster, smoother, and easier for the victim than it would otherwise be. As one experienced prosecutor summarized, 'a well-written report can make a jury trial into a bench trial and a bench trial into a guilty plea.'"

146. The Obama Administration, through the DOE and OCR, treated the April 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus has pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Then Secretary Lhamon, Assistant Secretary of the Department of Education ("DOE") in charge its Office for Civil Rights ("OCR"), delivered what was treated as marching orders by colleges and universities.

147. In February 2014, then Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." Assistant Secretary Lhamon told college officials attending a conference that existing practices for handling sexual misconduct complaints send a message "that victimized students are worth less than the people who assault them;" that school officials and she as "chief enforcer" needed to "radically change that message;" and that "if you don't want to do it together, I will do it to you." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

148. In June 2014, then Assistant Secretary Lhamon testified at a Senate Hearing in that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Assistant Secretary Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the April 2011 Dear Colleague Letter. Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to

terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. Assistant Secretary Lhamon additionally stood behind the "April 2011 Dear Colleague Letter."

149. In July 2014, then Assistant Secretary Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the April 2011 Dear Colleague Letter. "Do not think it's an empty threat," then Assistant Secretary Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce." Assistant Secretary Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working." Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014, available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832.

150. Then Assistant Secretary Lhamon was quoted in the Los Angeles Times stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," Los Angeles Times, August 17, 2015.

151. To support effectively making the "April 2011 Dear Colleague Letter" binding, the OCR hired hundreds of additional investigators for Title IX enforcement. The sharp increase in the number of investigations was accompanied by increases in the scope of OCR's investigations, in findings that schools had violated Title IX, and in the imposition of punitive

measures as a result. The Federal Government investigated over 250 schools for possible Title IX violations, including notable schools. According to the Chronicle of Higher Education, that number eventually grew to over 500. The overwhelming majority of OCR's investigations and findings have involved alleged violations of the rights of complaining students. Indeed, in 2016, OCR for the first time found Title IX violations in response to a complaint by a disciplined student.

152. The Obama Administration, through the DOE and OCR, treated the April 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus has pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Then Secretary Lhamon, Assistant Secretary of the Department of Education ("DOE") in charge its Office for Civil Rights ("OCR"), delivered what was treated and understood as marching orders by colleges and universities.

153. In February 2014, Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

154. In June 2014, then Assistant Secretary Lhamon testified at a Senate Hearing in that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Assistant Secretary Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter. Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to using all its tools to

ensure that all schools comply with Title IX . . .” She further told the Committee: “If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school.” Assistant Secretary Lhamon additionally stood behind the “April 2011 Dear Colleague Letter.”

155. Colleges and universities, including the University of Chicago, , were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice (“DOJ”). The White House issued a report entitled “Not Alone” in April 2014, which included a warning that if the OCR finds a Title IX violation, the “school risks losing federal funds,” that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools and that if a voluntary resolution cannot be reached, the DOJ may initiate litigation. In July 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. “Obama, Biden Won’t Visit Universities That Fall Short In Addressing Sexual Assault,” Huffington Post, July 4, 2016 (“The vice president said he’d like to take away federal funding from those universities.”)

156. To revoke federal funds -- the ultimate penalty -- is a powerful tool because educational institutions receive billions of dollars a year from the federal government. Anne Neal of the American Council of Trustees and Alumni was quoted as follows: “There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think.” She explained that “schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead.” “How Campus Sexual Assaults Came To Command New Attention,” NPR, August 12, 2014.

157. The DOE and OCR created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. “Presumed Guilty: College men accused of rape say the scales are tipped against them,” Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: “Under current interpretations of colleges’ legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman’s consent.” “Presumed Guilty: College men accused of rape say the scales are tipped against them,” Chronicle of Higher Education, September 1, 2014.

158. Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. “I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it.” “Some Accused Of Sexual Assault On Campus Say System Works Against Them,” NPR, September 3, 2014.

159. In response to pressure from OCR, DOJ, and the Obama White House, educational institutions, such as the University of Chicago, limited procedural protections afforded to male students, such as John Doe, in sexual misconduct cases.

160. The University of Chicago was also under campus pressures to vigorously prosecute males accused of sexual assault.

## C. The Department of Education Modifies Its Approach to Title IX Enforcement, Focusing on Fairness to All Parties.

161. In September 2017, the Department of Education took first steps toward restoring procedures that would provide basic fairness to both accusing and accused students in Title IX proceedings.

162. Recognizing the harmful results of the April 2011 Dear Colleague Letter, the Secretary of Education Betsy DeVos observed that "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by—or loss of funding from—Washington," that "no student should be forced to sue their way to due process," and that "[o]ne person denied due process is one too many." On September 7, 2017, Department of Education Secretary Betsy DeVos denounced the campus sexual misconduct proceedings as denying due process in a manner that is wholly un-American: www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforce- ment. Included in Secretary DeVos's speech was the following:

> Washington's push to require schools to establish these quasi-legal structures to address sexual misconduct comes up short for far too many students.
>
> . . . .
>
> Through intimidation and coercion, the failed system has clearly pushed schools to overreach. With the heavy hand of Washington tipping the balance of her scale, the sad reality is that Lady Justice is not blind on campuses today. This unraveling of justice is shameful, it is wholly un-American, and it is anathema to the system of self-governance to which our Founders pledged their lives over 240 years ago.
>
> . . . .
>
> Schools have been compelled by Washington to enforce ambiguous and incredibly broad definitions of assault and harassment.

163. Stating that "the era of 'rule by letter' is over" and "[t]here must be a better way forward," Secretary DeVos announced that the Department of Education would "launch a transparent notice-and-comment process to incorporate the insights of all parties" in an effort "to

ensure that America's schools employ clear, equitable, just, and fair procedures that inspire trust and confidence."

164. Then, on September 22, 2017, the Department of Education announced that it was withdrawing the 2011 Dear Colleague Letter and the 2014 Questions & Answers on Title IX Sexual Violence, noting in part the criticism of those documents for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness" and are "overwhelmingly stacked against the accused."

165. This withdrawal effected a reversion to 2001 Department of Education guidance, which reads in relevant part: "The Constitution also guarantees due process to students in public and State-supported schools who are accused of certain types of infractions. The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding."[5]

166. A Q&A on Campus Sexual Misconduct, which the Department adopted the same day, reflects a return to the original principles of Title IX, the Clery Act, and their implementing regulations, stating among other things that "the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred…;" that "[a] person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school;" that "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially;" and that "[a]n equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility

[5] Revised 2001 Department of Education Guidance, 19.

of parties and witnesses, synthesize all available evidence -- including both inculpatory and exculpatory evidence -- and take into account the unique and complex circumstances of each case."

167. Despite a different direction announced by the current White House Administration, colleges and universities have mostly continued with practices and policies in place created to comply with the April 2011 Dear Colleague Letter resulting in gender biased enforcement of Title IX. Columbia is one such university. When new regulations were proposed, then Columbia VP Suzanne Goldberg stated that Columbia would "stick by its current standards"[6] and remain "vigilant" despite the 2017 revocation of "Dear Colleague" guidance.[7]

168. On May 6, 2020, U.S. Secretary of Education Betsy DeVos announced new Title IX regulations. The U.S. Department of Education written announcement stated:

> The Final Rule requires schools to investigate and adjudicate formal complaints of sexual harassment using a grievance process that incorporates due process principles, treats all parties fairly, and reaches reliable responsibility determinations. A school's grievance process must:
>
> · Give both parties written notice of the allegations, an equal opportunity to select an advisor of the party's choice (who may be, but does not need to be, an attorney), and an equal opportunity to submit and review evidence throughout the investigation;
>
> · Use trained Title IX personnel to objectively evaluate all relevant evidence without prejudgment of the facts at issue and free from conflicts of interest or bias for or against either party;
>
> · Protect parties' privacy by requiring a party's written consent before using the party's medical, psychological, or similar treatment records during a grievance process;
>
> · Obtain the parties' voluntary, written consent before using any kind of "informal resolution" process, such as mediation or restorative justice, and not use an informal process where an employee allegedly sexually harassed a student;

---

[6] Valeria Escobar, "University pledges to maintain support for students as Trump administration announces new sexual misconduct rules," Columbia Daily Spectator, 11/20/2018.
[7] Aaron Holmes, " As Obama-era sexual assault policy is reversed, administrators vow to remain vigilant," Columbia Daily Spectator, 9/28/2017.

· Apply a presumption that the respondent is not responsible during the grievance process (often called a "presumption of innocence"), so that the school bears the burden of proof and the standard of evidence is applied correctly;

· Use either the preponderance of the evidence standard or the clear and convincing evidence standard (and use the same standard for formal complaints against students as for formal complaints against employees);

· Ensure the decision-maker is not the same person as the investigator or the Title IX Coordinator (i.e., no "single investigator models");

· For postsecondary institutions, hold a live hearing and allow cross-examination by party advisors (never by the parties personally); K-12 schools do not need to hold a hearing, but parties may submit written questions for the other parties and witnesses to answer;

· Protect all complainants from inappropriately being asked about prior sexual history ("rape shield" protections);

· Send both parties a written determination regarding responsibility explaining how and why the decision-maker reached conclusions;

· Effectively implement remedies for a complainant if a respondent is found responsible for sexual harassment;

· Offer both parties an equal opportunity to appeal;

· Protect any individual, including complainants, respondents, and witnesses, from retaliation for reporting sexual harassment or participating (or refusing to participate) in any Title IX grievance process;

- Make all materials used to train Title IX personnel publicly available on the school's website or, if the school does not maintain a website, make these materials available upon request for inspection by members of the public; and

· Document and keep records of all sexual harassment reports and investigations.

169. The new Title IX regulations requires, among other things, equal access to evidence; a grievance procedure that includes a live hearing at which the decision-maker must permit each party's advisor to ask the other party and any witnesses all relevant questions and

follow-up questions, including those questions challenging credibility. Such cross-examination at the live hearing must be conducted directly, orally, and in real time by the party's advisor of choice and never by a party personally. Before a complainant, respondent, or witness answers a cross-examination or other question, the decision-maker must first determine whether the question is relevant and explain any decision to exclude a question that is ruled not relevant.

170. The University failed in four ways the current DeVos Title IX due process regulations. *One*, contrary to 34 C.F.R. 106.45(b)(5)(i), the burden of proof was shifted on to John Doe, as the Univerity adhered to victim-centered "believe the woman" procedures. *Two*, the failure to give, to John Doe, Jane Roe 1's purported diary entries until three days before the hearing and access to Jane Roe 2's actual complaint until six weeks after his response was due to the complaint, did not give access required by 34 C.F.R. 106.45(b)(5)(v). *Three*, contrary to 34 C.F.R. 106.45(b)(6), cross-examination was not afforded to John Doe's advisor. *Four*, contrary to 34 C.F.R. 106.45(b)(6), a transcript or audio recording was not made of the hearings. The failure to comply with the 2020 regulations supports a finding of Title IX discrimination, *Doe v. American University*, 2020 WL 5593909 at *9 (D.D.C. Sept. 18, 2020). One reason for finding gender bias in *Doe v. Miami*, 882 F.3d 579, 594 (6th Cir. 2018), to hold the university liable under Title IX was that reduced protections for the accused has meant in practice that male respondents are sanctioned.

171. The University's position that the Title IX regulations that went into effect on August 14, 2020 did not apply to the University and that the University was free to apply its own non-Title IX Policies because the alleged sexual misconduct in John Doe's case occurred in off-campus apartments and John Doe was a threat to the University community based on unproven allegations and rumors, was legally erroneous, a pretext for not complying with the due process regulations currently in the Title IX regulations so as to find John Doe responsible for the alleged

sexual misconduct. John Doe, as a result of the suspension, has been excluded from "the recipient's education program or activity."

**D. <u>A Victim-Centered Process Favoring Female Complainants.</u>**

172. As noted above, the 2011 Dear Colleague Letter and April 2014 Q&A led colleges and universities, including Luther College, to devise victim centered procedures for adjudicating sexual assault that followed these mandates and, these mandates are not neutral and impartial. The reality is that males are almost always the "accused" respondents and females are almost always the "victim" complainants; one United Educators study showed 99% of the accused are male. (Complaint ¶ 20.) This belies Defendant's argument that the mandates are gender neutral because they eliminate procedural protections for anyone accused, male or female. The reality is that it is men who are losing procedural protections. If there is a bias against alleged sexual misconduct perpetrators, if the sexual misconduct accused are almost all male, and if the purpose of having university sexual misconduct proceedings is to protect women from sexual assault, which the 2011 Dear Colleague Letter shows, there is anti-male bias.

173. The University of Chicago adopted policies and procedures favoring students who file complaints of sexual misconduct and denying fundamental protections to accused students; the University of Chicago trains its officials to assume complaints of sexual misconduct are valid; the University of Chicago provides support services for complainants; the University of Chicago is aware that almost all persons who file complaints of sexual misconduct are female and almost all of the accused students are males; trauma-informed techniques based on pseudoscience allow authority figures to encourage alleged victims to create exaggerated or false memories; investigators are taught that an alleged victim's inability to recall crucial events and changing stories should not raise doubts about the veracity of an allegation; the phrase "believe all women"

means that when a female accuses a male of sexual misconduct, she is a "survivor" and her accusations are presumptively true. Cases recognize allegations of trauma-investigation techniques give rise to an inference of gender bias. *Norris v. Univ. of Colorado, Boulder*, 362 F.Supp.3d 1001, 1013 (D. Colo. 2019); *Doe v. Syracuse,* 2019 WL 2021026 (N.D.N.Y. May 8, 2019); *Doe v. Syracuse*, 2020 WL 2513691 (N.D.N.Y. May 15, 2020).

174. The University of Chicago has a victim-centered and gender biased process in which an accused male student is prosecuted under a presumption of guilt, improperly placing the burden of proof on the male student, and evaluates evidence according to gender biased assumptions to reach results finding males "responsible" to achieve "justice" according to "gender identity politics."

175. In the University of Chicago's sexual misconduct policies, the University of Chicago provides a long list of health and legal services for complainants of alleged sexual assault, but no services for respondents.

176. ''A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex." *Doe v.* Purdue, 928 F.3d at 668, quoting *Doe v. Columbia*, 831 F.3d 46, 58 n.11 (2d Cir. 2016). "There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults." *Doe v. Purdue*, 928 F.3d at 668, quoting *Doe v. Columbia*, 831 F.3d 46, 58 (2d Cir. 2016).

**E. John Doe Has Been Wrongly Found Responsible**
**<u>In A Gender-Biased Process: The Procedural Defects.</u>**

177. The September 2017 Dear Colleague Letter unequivocally recognizes that the procedures adopted by a school such as the University of Chicago covered by Title IX must accord due process to both parties involved. The practical reason why due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). But the University of Chicago did not apply the new Title IX regulations effective August 14, 2020, even though Jane Roe 1's and Jane Roe 2's's complaint, the investigation, the hearing and the Hearing Board decision occurred after August 14, 2020.

178. Starting with the investigation, the burden of proof was shifted on to John Doe and the questions asked during the investigation and hearing were geared to finding John Doe responsible as was presumed to be the case. The complaints of Jane Roe 1 and Jane Roe 2 were presumed to be 100% true and lacked supporting evidence that absent the presumption of guilt placed upon John Doe, would have been insufficient to find John Doe responsible for sexual misconduct.

179. The investigation in Jane Roe 1's case was biased in allowing Jane Roe 1 to submit, late, purported journal entries that provided the real basis for decision; without the purported journal entries, the hearing panel would have been compelled to find John Doe not responsible for sexual misconduct. The University, either on purpose or from acting negligently, failed to provide John Doe with the true copy of the actual Complaint that Jane Roe 2 submitted. Further, the investigations in both Jane Roe 1's case and Jane Roe 2's case gave Jane Roe 1 and Jane Roe 2 significantly more time to substantiate their cases with witness testimony and documents than given to John Doe.

## F. John Doe Has Been Wrongly Found Responsible In A Gender-Biased Process: The Evidence.

180. The anti-male gender biased nature of the sexual misconduct disciplinary proceedings against John Doe was reflected in the failure throughout the process to examine the motives and circumstances of Jane Roe 1 and Jane Roe 2. One primary reason for that dereliction was anti-male gender bias.

181. The evidence was clearly insufficient for finding John Doe responsible for the charges based on Jane Roe 1's complaint. Jane Roe 1 submitted no evidence during the course of a five-month long investigation and her outcry witnesses provide testimony that actually validate John Doe's claim of innocence. Both of Jane Roe 1's witness statements describe nothing close to a sexual assault or abuse incident, nor do they describe or corroborate any of the claims Jane Roe 1 made. It was the University's burden to find John Doe guilty versus John Doe having to prove his innocence. If the Committee hearing panel were truly adhering to the "preponderance of the evidence" standard, then the Committee hearing panel would have found John Doe not responsible. The Committee hearing panel did not find John Doe not responsible because of the gender bias that John Doe faced throughout the investigation process and hearing.

182. The evidence was clearly insufficient for finding John Doe responsible for the charges based on Jane Roe 2's complaint. John Doe pleaded guilty to the sexual harassment charge in this hearing because John Doe's support person advised him to do so in order to reduce his chances of expulsion, since the second Committee would be made privy to John Doe being found guilty in the Jane Roe 1 hearing. Jane Roe 2 submitted no evidence to corroborate her claims against John Doe. Jane Roe 2's roommate, who Jane Roe 2 claims was home when the alleged incident occurred, declined to interview as part of the process. Jane Roe 2 submitted no photos, video evidence, or eyewitnesses to validate her claims.

## G. <u>John Doe Received An Excessive Sanction Based In Part on Gender Bias.</u>

183. The anti-male gender biased nature of the sexual misconduct disciplinary proceedings against John Doe was reflected in a disproportionate sanction. John Doe, who had no prior disciplinary history and who believed he had consent for the sexual conduct that occurred, was suspended two years from the University of Chicago. The disproportionate sanction reflects a gender biased belief that males need to be sanctioned severely for sexual misconduct. Gruber, *Anti-Rape Culture*, 64 U. Kansas L. Rev. 1027, 1030 (2016).

184. The sanction impose disregarded the totality of circumstances surrounding John Doe's alleged conduct, among other facts: John Doe had no other disciplinary record; there was no use of force; the alleged misconduct occurred as two single, isolated incidents; no one other than Jane Roe 1 and 2 were affected by what happened the nights of November 15, 2020 and October 23, 2021 and thus there was no detriment to the health, safety and wellbeing of other members of the University of Chicago community.

## H. <u>Monetary and Injunctive Relief.</u>

185. As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, monetary damages of loss of salary, signing bonus, relocation bonus, performance bonus, and from the loss of educational and career opportunities, economic injuries, reputational injury, psychological damages, and other direct and consequential damages.

186. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints, ordering the ending of the suspension, enjoining

University of Chicago from preventing John Doe doing what is necessary to receive a master's degree from the University of Chicago and granting clearing of John Doe's transcript of the disciplinary record.

**SECOND CAUSE OF ACTION:**
**(State Law Breach of Contract)**

187. John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

188. The University of Chicago created an express and/or implied contract under Illinois law when John Doe accepted an offer of admission to the University of Chicago and paid the tuition and fees.

189. The University's violated its own non-Title IX *Policy on Harassment, Discrimination, and Sexual Misconduct* many times in the way it adjudicated the investigations in which John Doe was the respondent. The University failed to adhere its non-discrimination statement, included in section 3, and discriminated against John Doe on the basis of his race and sex.

*190.* The University violated section 10 of its *Policy on Harassment, Discrimination, and Sexual Misconduct,* when it invoked and emergency removal against John Doe, as a result of an alleged complaint that John Doe was never made aware of or that the University investigated.

*191.* The University violated sections 11 and 13 *of its Policy on Harassment, Discrimination, and Sexual Misconduct,* which governs *confidentiality and retaliation,* when John Doe made it aware to multiple University Officials within the Title IX Office, in addition to Dean Inabinet, of both Jane Roe 1 and Jane Roe 2 sharing images of their complaints to other students on campus. John Doe provided evidence of such instances to Dean Inabinet and argued that this breached confidentiality and was a form of retaliation. But Dean Inabinet did nothing.

*192.* In the Jane Roe 1 investigation and hearing, the University failed to follow its policy and student manual that governs the University-wide Disciplinary System. Per the *Student Manual*, the *Initial Inquiry* section states that:

> The complainant should make every effort to include in the complaint all germane facts known at that time and provide all available supporting materials. Upon receipt of the written complaint…

Jane Roe 1 failed to submit journal entries as part of her Complaint or during the 5-month long investigation that, per the Committee's outcome letter, were leveraged by the Committee to find Jane Roe 1 as more credible than John Doe.

193. Jane Roe 1 claimed that the purported journal entries were written in 2020, and thus she had plenty of time to submit them with her initial complaint in November 2021 or shortly thereafter.

194. Section 16 of the *Policy on Harassment, Discrimination, and Sexual Misconduct*, which governs *Access to Information,* states:

> The Complainant, the Respondent, and appropriate University officials will receive timely and equal access to information that will be used during the Investigative/Hearing Body Resolution process.

195. Section 16 was ignored by Jane Roe 1 and disregarded by the investigator Dean Inabinet. John Doe received access to Jane Roe 1's optional response two business days prior to the date of the hearing. Jane Roe 1's last-minute inclusion of the journal evidence in her the optional response should have resulted in an extension of the hearing date to allow for a thorough investigation of this new evidence. This would have resulted in a fair and impartial process by which the University could have ensured that John Doe was given timely access to all of the evidence.

196. Dean Inabinet did not follow the *Format and Order of Proceedings* stated within the *Student Manual.* At the onset of the Roe 1 hearing, Dean Inabinet volunteered what was his own testimony to support and give credence to Jane Roe 1's last-minute supplied purported journal entry submissions. A substantive portion of the hearing commenced with Dean Inabinet informing the Committee – unprompted – as to how he vetted a journal submission that Complainant included in her optional response. The Hearing Committee did not ask the investigator any questions about the purported journal entries. The University Outline for the hearing process does not grant the investigator any authority to volunteer information, in effect to testify as a witness to the sufficiency of evidence, that could affect the outcome of the hearing.

197. In the Jane Roe 2 investigation and hearing, the University again violated section 16: Access to Information of the *Policy on Harassment, Discrimination, and Sexual Misconduct* and the *Initial Inquiry* section of the *Student Manual* governing the University-Wide Disciplinary System.

198. The *Initial Inquiry* section of the *Student Manual* states*:*

> Associate Dean will provide the respondent with access to the complainant's written statement and the respondent will be required to provide a written response to the complaint.

199. John Doe did not receive the actual Complaint that Roe 2 submitted until 6 weeks after his response to the complaint was due on December 15, 2021. . In her denial of John Doe's appeal, Dean Cortez Vazquez notes that an 'administrative delay' caused the aforementioned error. In his affidavit supporting the University's opposition to Plaintiff's motion for a PI, Dean Inabinet states that his assistant made an 'error' that led to such error and the error was not corrected until 2/3/22. This 'administrative delay' and/or 'error' was a deviation from policy that impacted John Doe's strategy for the Jane Roe 2 investigation and ultimately altered the outcome of the hearing.

200. Furthermore, section 16 of the Policy states:

> The Complainant, the Respondent, and appropriate University officials will receive timely and equal access to information that will be used during the Investigative/Hearing Body Resolution process.

201. A rational and impartial individual could determine that by failing to provide John Doe with Jane Roe 2's actual Complaint until six (6) weeks after his response to such Complaint was due, that the University did not provide him with timely or equal access to the Information used in the Investigative/Hearing Body Resolution Process.

202. Many violations of section 18 of the Policy, which governs *Required Training for Policy Personnel,* occurred.

203. Dean Inabinet incorporated faulty and egregious witness statements in the investigation report in order to bolster Jane Roe 2's credibility. As an impartial investigator, he should have removed facts he knew to be false, or clarified ambiguous statements from witnesses in order to ensure the information being compiled in the report from witness statements was accurate.

204. One of Jane Roe 2'switnesses claimed John Doe sexually assaulted Jane Roe 2, which Jane Roe 2 did not even allege in her Complaint. This is an example of Dean Inabinet knowing of a false statement and still deciding to include it in the investigation report – which is breach of policy and evidence of him acting as a biased investigator.

205. Section 18 also states policy personnel are trained on:

> …how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias.

206. Both Susanne Paulus and Michael Allen, per their actions previously stated in this Complaint, did not act in an impartial, unbiased manner during the hearing.

207. The *Notification of Outcome and Requests for Review* section of the *Student Manual* states:

> "The complainant and respondent will receive simultaneous formal and written notification of the outcome, including information regarding requesting review, within 5 business days of the hearing."

208. John Doe did not receive formal notification of the Jane Roe 2 outcome until 14 days after the hearing. This disadvantaged John Doe by delaying his ability to seek an appeal as promptly as he could have.

209. The University of Chicago Policy provides for an investigation process setting the times when evidence is to be submitted. The University of Chicago Policy provides that students are to have impartial investigators investigate the case and impartial hearing officers hear the case, and thereby provide a fair and impartial disciplinary process in which it is the responsibility of the University of Chicago to show that a violation has occurred before any sanctions are imposed. The University of Chicago Policy also requires the use of the preponderance of the evidence standard with the burden of proof on the school. The University of Chicago breached its contract with John Doe when it failed to abide by University policy in investigations as detailed above, when it failed to have impartial investigators and hearing officers to conduct a fair and impartial process that treated John Does and Jane Roes equally and when it failed to adhere to the preponderance of the evidence standard, with presumption of innocence of the respondent, including by not using the proper burden of proof standard, by effectively shifting the burden of proof to John Doe.

210. Based on the aforementioned facts and circumstances, the University of Chicago breached its express and/or implied contract with John Doe because the University of Chicago breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe. The University of Chicago failed its duty of good faith and fair dealing when it

committed the procedural and substantive errors complained of above, meted out a disproportionate sanction notwithstanding the flawed process and found John Doe responsible despite the lack of evidence in support of Jane Doe's allegations of sexual misconduct.

211. John Doe is entitled to recover damages for the University of Chicago's breach of the express and/or implied contractual obligations described above. As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

212. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**THIRD CAUSE OF ACTION:**
**(State Law Promissory Estoppel)**

213. John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

214. The University of Chicago's various policies constitute representations and promises that the University of Chicago should have reasonably expected to induce action or forbearance by John Doe.

215. The University of Chicago expected or should have expected John Doe to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that the University of Chicago would not tolerate, and John Doe would not suffer, harassment by fellow students and would not deny John Doe his procedural rights should he be accused of a violation of the University of Chicago Policies.

216. John Doe relied to his detriment on these express and implied promises and representations made by the University of Chicago.

217. As alleged above in connection with the causes of action for Title IX violations and breach of contract, the actions of the University of Chicago were arbitrary in its conduct of and decision-making in the two disciplinary proceedings against John Doe.

218. Based on the foregoing, the University of Chicago is liable to John Doe based on estoppel.

219. As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against Luther College as follows:

(i) on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against the University of Chicago awarding John Doe:

(a) an injunction vacating the disciplinary findings and decision with respect to John Doe, ordering the ending of the suspension, granting clearing of John Doe's transcript of the disciplinary record, and enjoining the University of Chicago from preventing John Doe doing what is necessary to receive a Masters of Business Administration degree from the University of Chicago; and

(b) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

(ii) on the second cause of action for state law breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without

limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii) on the third cause of action for state law promissory estoppel, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(iv) awarding John Doe such other and further relief as the Court deems just, equitable and proper.

**JURY DEMAND**

Plaintiff John Doe demands a trial by jury of all issues presented herein that are triable by a jury.

**Dated: New York, New York**
**April 12, 2023**


**Respectfully submitted,**
**NESENOFF & MILTENBERG, LLP**
**By: /s/** *Philip A. Byler*
**Philip A. Byler, Esq. (pro hac vice forthcoming)**
**Andrew T. Miltenberg,Esq.(pro hac vice forthcoming)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**212-736-4500**
**pbyler@nmllplaw.com**
**amiltenberg@nmllplaw.com**

**MICHAEL CHERONIS, ESQ.**
**2502 N. Clark St**
**Chicago, IL 60614**
**773-255-1430**
***Attorneys for Plaintiff John Doe***

## **CERTIFICATE OF SERVICE**

I, Philip A. Byler, Esq., caused to be served the foregoing document by e-mail upon:

Scott Warner, Esq.
Husch Blackwell LLP
312-526-1633
Scott.Warner@huschblackwell.com

Dated: April 12, 2023

______*Philip A. Byler, Esq.*_____
Philip A. Byler, Esq.